## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM, INC., | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PRIME HEALTHCARE SERVICES, INC., | ) ) | |
| PRIME HEALTHCARE SERVICES - SAINT JOHN LEAVENWORTH, LLC, and | ) ) ) | |
| PRIME HEALTHCARE SERVICES - PROVIDENCE, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendants, Prime Healthcare Services, Inc. ("**Prime**"), Prime Healthcare Services - Saint John Leavenworth, LLC ("**Prime Saint John**"), and Prime Healthcare Services - Providence, LLC ("**Prime Providence**") (collectively, "**Defendants**"), by and through their counsel, and pursuant to 28 U.S.C. § 1441 *et seq.*, remove the above-styled action heretofore pending in the District Court of Leavenworth County, Kansas to the United States District Court for the District of Kansas. In support of this removal, Defendants state:

1.    Plaintiff, Sisters of Charity of Leavenworth Health System, Inc. ("**SCLHS**"), commenced this action, styled *Sisters of Charity of Leavenworth Health System, Inc. v. Prime Healthcare Services, Inc., Prime Healthcare Services-Saint John Leavenworth, LLC, and Prime Healthcare Services-Providence, LLC*, Case No. 2013-CV-271 (the "**Action**"), by filing a Petition Pursuant to K.S.A. Chapter 60 (the "**Petition**") with the District Court of Leavenworth County, Kansas on June 21, 2013.

2.     In the Action, SCLHS alleges, in Count I, that Prime breached a contract with SCLHS by failing to make a required payment, and further alleges, in Counts II and III, that a declaratory judgment is necessary and appropriate to terminate uncertainty and insecurity regarding SCLHS's contractual relationship with Prime.

3.     A copy of the Petition and service of process forms are attached hereto as **Exhibit 1**. A copy of the Leavenworth County, Kansas District Court Docket Sheet is attached as **Exhibit 2**. On June 28, 2013, undersigned counsel made an Entry of Appearance, a copy of which is attached hereto as **Exhibit 3**. On July 11, 2013, pursuant to Defendants' request and Kansas Supreme Court Rule 113, the Clerk of the District Court of Leavenworth County, Kansas granted Defendants an extension of time to answer or otherwise respond to the Petition, a copy of which is attached hereto as **Exhibit 4**. Defendants are unaware of the existence of any process, pleadings, or orders other than those identified above. Furthermore, no motions are pending before the state court in this matter, nor are any hearings presently set.

4.     As set forth more fully below, this case is properly removed to this Court under 28 U.S.C. § 1441 because Defendants have satisfied the procedural requirements for removal and this Court has subject matter jurisdiction under 28 U.S.C. § 1332.

## I.     DEFENDANTS HAVE SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

5.     Each of the Defendants was served with process on June 21, 2013. (Ex. 1.) This Notice of Removal is timely filed within thirty (30) days of receipt of the Summons and Petition by service upon Defendants. *See* 28 U.S.C. § 1446(b).

6.     Under the provisions of 28 U.S.C. § 1441 *et seq.*, the right exists to remove this cause of action from the District Court of Leavenworth County, Kansas to the United States District Court for the District of Kansas, which embraces the place where this action is pending. *See* 28 U.S.C. §§ 1441(a), 1446(a).

7.     A copy of the Notice of Filing of Notice of Removal directed to the District Court of Leavenworth County, Kansas and counsel for SCLHS, is attached as **Exhibit 5**.

8.     A copy of Defendants' Civil Cover Sheet is attached as **Exhibit 6**.

## II.     THIS COURT HAS DIVERSITY JURISDICTION.

9.     This action is of a civil nature in which the district courts of the United States have been given original jurisdiction pursuant to 28 U.S.C. § 1332 in that there exists diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs. So this case may be properly removed to this Court pursuant to 28 U.S.C. § 1441.

### A.     The amount in controversy requirement is satisfied.

10.     In the Petition, SCLHS expressly states that the amount it seeks to recover is in excess of $75,000, thus satisfying the amount in controversy requirement of 28 U.S.C. § 1332(a). (Ex. 1, Petition, at p. 7, prayer for relief.)

### B.     There is complete diversity of citizenship between Plaintiff and Prime, the only properly-joined defendant.

11.     SCLHS is now, and was at the time this action commenced, a not-for-profit corporation organized under the laws of the State of Kansas, with its principal place of business in Denver, Colorado. (*See* Ex. 1, Petition, ¶ 1.) For purposes of determining diversity jurisdiction, SCLHS is therefore a citizen of Kansas and Colorado. *See* 28 U.S.C. § 1332(c).

12.    Defendant Prime Healthcare Services, Inc. is now, and was at the time this action commenced, a Delaware corporation with its principal place of business at 3300 East Guasti Road, Ontario, California. (*See* Ex. 1, Petition, ¶ 2.) For purposes of determining diversity of citizenship, Prime is therefore a citizen of Delaware and California. *See* 28 U.S.C. § 1332(c).

13.    Thus, complete diversity exists between SCLHS and Prime, the only properly joined parties to this lawsuit.

14.    In an effort to destroy this complete diversity, SCLHS has fraudulently joined Prime Saint John and Prime Providence, which both have Kansas (and Delaware) citizenship. (*See* Ex. 1, Petition, at ¶¶ 3–4.) As set forth below, federal law requires not only that this Court disregard the citizenship of Prime Saint John and Prime Providence for purposes of determining diversity jurisdiction, but also that these two parties be dismissed from this lawsuit.

**C.    Under "fraudulent joinder" principles, the citizenship of Prime Saint John and Prime Providence should be disregarded for purposes of determining diversity jurisdiction.**

15.    The Court should consider only the citizenship of properly-joined defendants in determining whether diversity of citizenship requirements have been met. *Smoot v. Chicago R.I. & P. R. Co.*, 378 F.2d 879, 882 (10th Cir. 1967) ("[U]pon specific allegations of fraudulent joinder the court may pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available. *The joinder of a resident defendant against whom no cause of action is stated is patent sham*, and though a cause of action be stated, *the joinder is similarly fraudulent if in fact no cause of action exists* . . . .") (emphases added) (internal quotations and citations omitted). "[F]ederal courts must vigilantly protect a defendant's right to proceed in federal court against abuses and manipulations by the plaintiff." *Anderson v. Ford Motor Co.*, 303 F. Supp. 2d 1253, 1258 (W.D. Okla. 2004).

16.     "Fraudulent joinder need not involve actual fraud in the technical sense. Instead, it can occur when the plaintiff joins a 'resident defendant against whom no cause of action is stated' in order to prevent removal under a federal court's diversity jurisdiction." *Anderson v. Lehman Bros. Bk., FSB*, No. 12-4135, 2013 WL 2934303, at *2 (10th Cir. June 17, 2013) (unpub. op.) (quoting *Dodd v. Fawcett Publ'ns., Inc.*, 329 F.2d 82, 85 (10th Cir. 1964)). "When this occurs, the district court disregards the fraudulently joined non-diverse party for removal purposes." *Id.* **"In addition, the 'citizens' upon whose diversity a plaintiff grounds jurisdiction <u>must</u> be real and substantial parties to the controversy. Thus, a federal court <u>must</u> disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."** *Id.* (quoting *Lenon v. St. Paul Mercury Ins. Co.*, 136 F.3d 1365, 1369 (10th Cir. 1998) (emphases added) (internal quotation marks omitted).

17.     In this Action, SCLHS has stated a potential claim only against Prime, and <u>not</u> against Prime Saint John or Prime Providence. Put simply, SCLHS claims that the TSA required Prime to make monthly payments for services performed pursuant to the TSA. (Ex. 1, Petition, at ¶ 30.) SCLHS then claims that Prime did not make *one* of its payments in the full amount owed. (Petition, at ¶ 33.) However, rather than give Prime written notice of this alleged shortfall—as the TSA requires in its cure and notice provisions— SCLHS rushed its lawsuit to the Courthouse without any prior notice (as required in the TSA). Instead, the first notice to Prime of the alleged deficiency was service of the instant lawsuit. In fact, Prime has paid the amount in controversy and SCLHS maintains this Action without any reasonable basis in fact or law.

18.     That SCLHS has only properly stated a potential cause of action against Prime— and not Prime Saint John or Prime Providence—is evident from face of the Petition itself. SCLHS recognizes that "*SCLHS* and *Prime* entered into a Transition Services Agreement (the

'TSA')," and that this contract is solely "between *Prime* and *SCLHS.*" (Petition, at ¶¶ 9, 29 (emphases added).) Prime Saint John and Prime Providence are not parties to the TSA, or *any* contract with SCLHS. Indeed, the Petition makes no allegation that any contractual (or other) obligations exist between SCLHS and Prime Saint John or Prime Providence. Nor are Prime Saint John or Prime Providence even alleged to be third-party beneficiaries. In sum, the only real parties to this controversy are SCLHS and Prime.

19.     Indeed, the only contractual obligations alleged by SCLHS in the Petition arise solely between SCLHS and Prime ***under the TSA***:

- "*Under the TSA*, Prime has a duty . . . ." (Petition, ¶ 30);

- "SCLHS has performed all of its obligations *under the TSA.*" (Petition, ¶ 31)

- "breaches of the express terms *of the TSA*" (Petition, ¶ 34)

- "Prime's . . . *breach of the TSA*"; "Prime's duty to pay SCLHS *under the TSA*" (Petition, ¶ 35)

- "Prime's obligation to pay SCLHS for services provided *under the TSA*" (Petition, ¶ 36)

- "Prime's performance *under the TSA*" (Petition, ¶ 37);

- "during the Term *of the TSA*" (Petition, ¶ 38)

- "Prime has materially *breached the TSA* by failing and refusing to pay SCLHS *as required by the TSA* . . . ." (Petition, ¶ 39).

(emphases added). No breach of contract allegation is made against either Prime Saint John or Prime Providence. Indeed, no such contract even exists from which a breach could occur.

20.     In an effort to (fraudulently) disguise this truth, SCLHS alleges, in conclusory fashion, that ambiguous "Defendants' actions, failure to act, and lack of cooperation are *breaches of the express terms of the TSA*, as well as the implied covenant of good faith and fair dealing." (Petition, ¶ 34 (emphasis added).) In equally ambiguous fashion, SCLHS claims that

"sending out the bills" requires "Defendants to undertake certain actions and to cooperate with SCLHS." (Petition, ¶ 32.) These averments or conclusions of law should be disregarded. *See Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1238 (D. Kan. 2003) ("The Court also disregards conclusory statements and statements that are conclusions of law rather than statements of fact."). Furthermore, the Petition alleges no set of facts which could give rise to any possible contractual duty or other obligation owed by Prime Saint John or Prime Providence to SCLHS. Moreover, if this Court wishes to further "pierce the pleadings," pursuant to a fraudulent joinder analysis under Tenth Circuit precedent, Defendants invite the Court's consideration to the TSA, attached here as **Exhibit 7**. There is simply no reasonable basis in fact or law to support a claim on behalf of SCLHS against either Prime Saint John or Prime Providence.

21.     Well-established Tenth Circuit and Kansas law reinforces these basic contract principles. "In causes of action arising from a contract, only parties to the contract may enforce the contract because 'the person who possesses the right sought to be enforced' is the real party in interest." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 675 (10th Cir. 2007) (quoting *O'Donnell v. Fletcher*, 681 P.2d 1074, 1076 (Kan. Ct. App. 1984)). It follows that a contract cannot be enforced against an entity that was not a party to the contract. In other words, just as Prime Saint John and Prime Providence could not presently sue SCLHS for any cause of action allegedly arising from the TSA (because they were not parties to the contract), SCLHS cannot properly sue Prime Saint John or Prime Providence for any such cause of action. Only parties to that contract may sue or be sued.

22.     Perhaps most revealing of the true nature of SCLHS's claims, SCLHS requests no relief against either Prime Saint John or Prime Providence in Count I of the Petition, which is the

gravamen of the entire lawsuit. Rather, SCLHS requests relief only against Prime. (Petition, at p. 7, prayer for relief ("SCLHS respectfully requests judgment in its favor and against Prime and for damages, in excess of $75,000, in the amount sufficient to fully compensate SCLHS for Prime's breaches, as well as prejudgment interest . . . .").)

23.     SCLHS's declaratory judgment actions under Counts II and III of the Petition likewise do not state a cause of action against Prime Saint John or Prime Providence. Count II stems solely from Prime's alleged breach of the TSA. On the one hand, Prime Saint John and Prime Providence, once again, are not parties to that contract, and have no rights, status, or other legal relations related to the TSA that could possibly be affected by any legal determination by a court. *See* K.S.A. 60-1701. In other words, Prime Saint John and Prime Providence have <u>no</u> "interest which would be affected by [any potential] declaration" concerning the TSA. *See* K.S.A. 60-1712. Notwithstanding SCLHS's request that the Court declare that ambiguous "Defendants shall cooperate in the billing process and other Services required to be performed by SCLHS *under the TSA*," it is simply impossible that Prime Saint John or Prime Providence has any such duty or obligation; rather, any such duty would fall solely on Prime's shoulders. (*See* Petition, at pp. 8–9, Count II prayer for relief, at (iii) (emphasis added).)

24.     On the other hand, because Prime has actually paid the full amount of the invoice in question, there is no uncertainty or controversy between SCLHS and Prime. *See* K.S.A. 60-1708; *In re Estate of Keller*, 46 P.3d 1135, 1137–38 (Kan. 2002) ("Declaratory relief is not to be entertained for the purpose of settling abstract questions . . . . Moreover, declaratory relief is generally not available to a party unless that party has been in some way injured or aggrieved thereby." (internal citations omitted)). "We also think it important to emphasize that the declaratory relief sought is not appropriate in this case since there is no justiciable controversy

between adverse parties. It is of course horn-book law that there must be at least two parties who can assert rights which have developed or will arise against each other before an actual controversy can exist which is justiciable under our declaratory judgment act." *Id.* Just as Prime Saint John and Prime Providence has no valid declaratory judgment claims (or any claims whatsoever) against SCLHS, the opposite also holds true regardless of how SCLHS attempts to spin it: SCLHS has no claim for declaratory judgment against Prime Saint John or Prime Providence. The only potentially viable causes of action are between SCLHS and Prime. Even under SCLHS's best case scenario, Prime Saint John and Prime Providence, which have never had any relations with SCLHS, could *never* be anything more than nominal or formal parties, so there citizenship must be disregarded for purposes of diversity jurisdiction. *Anderson v. Lehman Bros. Bk., FSB*, No. 12-4135, 2013 WL 2934303, at *2 (10th Cir. June 17, 2013) (unpub. op.) (citing quoting *Lenon v. St. Paul Mercury Ins. Co.*, 136 F.3d 1365, 1369 (10th Cir. 1998)).

25.     Going a requisite step further, once it has been determined that a party has been fraudulently joined, the district court is "required to dismiss him from the case without prejudice." *Brazell v. Waite*, No. 12-4047, 2013 WL 2398893, at *6 (10th Cir. June 4, 2013) (citing *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1249 (10th Cir. 2004)). Therefore, removal is proper, and Prime Saint John and Prime Providence should be dismissed from this action *instanter*.

26.     Turning to Count III, SCLHS once again alleges that "[a]n actual controversy exists between SCLHS, Prime, Prime St. John and Prime Providence regarding the extent of Defendants' rights under the [TSA]," as well as under a separate contract, the Asset Purchase

Agreement ("APA").[1] As set forth above, Prime Saint John and Prime Providence have no rights under the TSA, and under SCLHS's best case scenario, Prime Saint John and Prime Providence might somehow be mere nominal or formal parties for which their citizenship is disregarded here. The same holds true as to the APA. The APA, made and entered into as of January 18, 2013, is between SCLHS and Prime. Neither Prime Saint John nor Prime Providence is a party to the APA. In fact, Prime Saint John and Prime Providence were not even formed until February 2013. (*See* **Exhibit 8**.) Thus, no possible cause of action exists against Prime Saint John or Prime Providence.

27.     Finally, to the extent SCLHS alleges that Prime Saint John and Prime Providence are "necessary indispensible parties to this action," these conclusory averments or conclusions of law should be summarily disregarded. *See Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1238 (D. Kan. 2003). As fully explored above, no cause of action exists against either Prime Saint John or Prime Providence. Moreover, under the *facts alleged* (or even as they exist under the attached TSA), Prime Saint John and Prime Providence are neither necessary nor indispensible parties. Rather, in the absence of Prime Saint John and Prime Providence, "complete relief" could still be accorded to SCLHS (assuming it is entitled to any, which Defendants deny). *See* F.R.C.P. 19(a)(1)(A). Moreover, Prime Saint John and Prime Providence claim <u>no</u> interest related to the subject of the action. *See* F.R.C.P. 19(a)(1)(B). Put simply, Prime Saint John and Prime Providence are not even necessary parties, let alone indispensible parties. *See, e.g.*, *EquiMed, Inc. v. Genstler*, 170 F.R.D. 175, 178–79 (D. Kan. 1996) (analyzing *Rishell v. Jane Phillips Episcopal Memorial Med. Ctr.*, 94 F.3d 1407, 1411–12 (10th Cir. 1996)).

---

[1] Due to the volume of the APA and its corresponding exhibits, Defendants have not attached the APA to this Notice of Removal. However, should the Court deem it appropriate or beneficial, or should SCLHS contest the nature of Defendants' description of such herein, Defendants will be pleased to present a copy of the APA for the Court's consideration.

### III.    CONCLUSION.

Defendants, Prime Healthcare Services, Inc., Prime Healthcare Services - Saint John Leavenworth, LLC, and Prime Healthcare Services - Providence, remove the above-entitled action from the District Court of Leavenworth County, Kansas to the United States District Court for the District of Kansas. Furthermore, Defendants Prime Healthcare Services - Saint John Leavenworth, LLC and Prime Healthcare Services - Providence, LLC should be dismissed from this lawsuit without prejudice *instanter*.


### DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Rule 40.2, Defendants designate Kansas City, Kansas as the place for the trial of this action.


Dated: July 19, 2013.                               LATHROP & GAGE LLP


By:    /s/ Curtis L. Tideman
Curtis L. Tideman, KS #13433
ctideman@lathropgage.com
Mark A. Samsel, KS #24551
msamsel@lathropgage.com
10851 Mastin Blvd., Suite 1000
Overland Park, KS  66210-1669
Telephone: (913) 451-5100
Telecopier: (913) 451-0875

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on this 19th day of July, 2013, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, and that a copy was sent by first-class, United States mail, postage prepaid, with a copy also by email, to the following:

Jeffrey J. Simon
Michael S. Hargens
Judd M. Treeman
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Jeff.Simon@huschblackwell.com
Michael.Hargens@huschblackwell.com
Judd.Treeman@huschblackwell.com

ATTORNEYS FOR PLAINTIFF

/s/ Curtis L. Tideman
An Attorney for Defendants

FILED
LEAVENWORTH CO. KS
2013 JUN 21   PM 1:58

CLERK OF DIST COURT

IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS
CIVIL DIVISION

SISTERS OF CHARITY                  )
OF LEAVENWORTH                      )
HEALTH SYSTEM, INC.,                )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )   Case No. 2013 CV 271
                                    )
PRIME HEALTHCARE SERVICES, INC.;    )
PRIME HEALTHCARE                    )   JURY TRIAL DEMANDED
SERVICES – SAINT JOHN               )
LEAVENWORTH, LLC; and               )
PRIME HEALTHCARE                    )
SERVICES – PROVIDENCE, LLC,         )
                                    )
        Defendants.                 )

## PETITION PURSUANT TO K.S.A. CHAPTER 60

Plaintiff Sisters of Charity of Leavenworth Health System, Inc., ("SCLHS") states the following in support of its claims against Defendants Prime Healthcare Services, Inc. ( "Prime"), Prime Healthcare Services – Saint John Leavenworth, LLC, and Prime Healthcare Services – Providence, LLC (collectively, "Defendants"):

### Parties

1.      SCLHS is a not-for-profit corporation organized under the laws of the state of Kansas, with its principal place of business in Denver, Colorado.

2.      Prime is a Delaware corporation with its principal place of business at 3300 East Guasti Road, Ontario, California.  Prime may be served through its registered agent, Registered Agent Kansas, Ltd., 10851 Mastin Blvd. Suite 1000, Overland Park, Kansas 66210.

3.      Prime Healthcare Services – Saint John Leavenworth, LLC (hereinafter, "Prime St. John") is a Delaware corporation with its principal place of business at 3500 4th Street,

KCP-4334879

**EXHIBIT 1**

Leavenworth, Kansas 66048. Prime St. John may be served through its registered agent, National Corporate Research, Ltd., at 2101 S.W. 21st Street, Topeka, Kansas.

4.     Prime Healthcare Services – Providence, LLC (hereinafter, "Prime Providence") is a Delaware corporation with its principal place of business at 8929 Parallel Parkway, Kansas City, Kansas. Prime Providence may be served through its registered agent, National Corporate Research, Ltd., at 2101 S.W. 21st Street, Topeka, KS 66604.

### Jurisdiction

5.     This Court has jurisdiction pursuant to Kan. Stat. Ann. § 60-308 because Defendants transact business in this state and because Prime acts within this state as director, manager, trustee, or other officer of a corporation organized under the laws of or having a place of business within this state.

6.     This Court has jurisdiction pursuant to Kan. Stat. Ann. § 60-1701 to declare the rights, status, and other legal relations whether or not further relief is, or could be sought.

7.     Venue is proper pursuant to Kan. Stat. Ann. § 60-604.

### Facts Common to All Counts

8.     On or about January 18, 2013, Prime and SCLHS entered into an Asset Purchase Agreement, whereby Prime agreed to purchase two hospitals owned by SCLHS, St. John Hospital, Inc., located in Leavenworth County, Kansas (hereinafter, "St. John Hospital"), and Providence Medical Center, Inc., located in Wyandotte County, Kansas (hereinafter, "Providence Hospital").

9.     Effective April 1, 2013, SCLHS and Prime entered into a Transition Services Agreement (the "TSA"). Under the TSA, SCLHS was to provide certain services to Prime,

Prime St. John, and Prime Providence in order to assist in the transition of ownership and operations of St. John and Providence Hospitals.

10.     St. John Hospital is operated by Prime St. John.

11.     Providence Hospital is operated by Prime Providence.

12.     Under the terms of the TSA, Prime is to pay SCLHS for its transition Services, as defined in the TSA, and reimburse SCLHS for any costs or fees incurred for such Services during a Term beginning on April 2013 and expiring in March 2014.

13.     In consideration for the Services provided under the TSA, Prime is obligated to pay SCLHS the amounts as set forth in the TSA.

14.     Among the Services to be provided is a "Revenue Services Center."   In consideration for SCLHS' provision of these Revenue Service Center Services, Prime agreed to pay SCLHS monthly Business Continuation Service fees.

15.     One such Service was to manage end-to-end billing activities for patients, from patient access through collections.   During April and May 2013, SCLHS performed its obligations regarding the Services described in the TSA, including Services associated with the Revenue Services Center and patient billing.   Despite SCLHS' performance of its obligations, however, the bills for services during this time period were not sent due solely to Defendants' actions and failures to act.

16.     Specifically, SCLHS and Defendants jointly made operating decisions which defined the processes and procedures necessary to perform end-to-end billing. Throughout April and May, SCLHS worked with Defendants to implement changes to three critical billing requirements to complete the billing cycle:   First, Defendants insisted that they have the opportunity to review and approve the coding of all claims prepared by SCLHS before those

3

claims were sent to Payers, such as Medicare and private insurance companies. Second, Defendants were responsible for modifying their own billing software system, known as Emdeon, to allow the Providence and St. John bills to be processed. Third, Defendants wanted the payments to be processed through their own lockbox. This required Defendants to comply with certain regulatory requirements which would allow Payers to accept bills from Defendants for these facilities, including notifying Payers (such as Medicare and private health insurance companies), and obtaining the proper credentialing and government insurance identifications.

17.     Defendants failed to perform their responsibilities.   Specifically, Defendants never approved the claims prepared by SCLHS; Defendants did not modify their own software and billing systems in a timely fashion; and Defendants did not undertake and complete the necessary regulatory requirements.   Due to Defendants' failure to perform their responsibilities, the bills were not sent to Payers.

18.     On June 6, 2013, Prime informed SCLHS that Prime would withhold monthly payments required by the TSA, including payments for Services associated with the Revenue Service Center, because the April and May bills had not been sent out.

19.     On June 15, 2013, Prime failed to timely tender payments due to SCLHS under the TSA, including payments for Services performed in April 2013 involving the Revenue Service Center, thereby breaching the TSA, injuring SCLHS, and causing SCLHS to suffer damages as a result.

20.     By refusing payment and failing to perform its responsibilities, Prime has breached its obligations under the TSA. In addition, Prime has raised uncertainty and insecurity with respect to SCLHS' and Prime's rights and legal relations under the TSA for the remainder of its Term.

KCP-4334879

21.     Because the Services are performed to assist in the transition of critical healthcare services at St. John and Providence Hospitals, and because Prime St. John and Prime Providence operate and manage these two hospitals, Prime St. John and Prime Providence are necessary and indispensable parties to this action.

22.     The parties also have a dispute regarding Defendants' rights to certain intellectual property and proprietary expertise belonging to SCLHS. The rights—or lack thereof—in dispute are defined by certain agreements between SCLHS and Prime.

23.     In the Asset Purchase Agreement, SCLHS made no assignment of its proprietary expertise or intellectual property to Prime. Specifically, Prime received no rights whatsoever to Epic, SCLHS' Epic instance, or other software or intellectual property rights belonging to SCLHS. In fact, such intellectual property is specifically excluded from the assets transferred to Prime.

24.     The TSA also provides that Prime has no right to SCLHS' proprietary expertise and intellectual property beyond the very limited rights expressly provided by SCLHS. Section 2.4 of the TSA specifically provides in part:

> SCLHS and its affiliates have incurred substantial time and expense in the development of proprietary expertise and intellectual property which may be used in the provision of Services, including without limitation order sets and other licensee-definable aspects of the Epic EMR instance in place for [St. John and Providence] (collectively, "SCLHS' IP"). While SCLHS' IP will of necessity be used in the provision of Services, [Prime] shall have no right to SCLHS' IP beyond its limited, non-transferrable license to such SCLHS' IP in [Prime's] use of Services. As Services expire or are terminated, Prime shall have no further right to SCLHS' IP and shall return or destroy all software and other embodiments of SCLHS' IP and shall certify to SCLHS such return or destruction, from time to time as SCLHS may reasonably request.

25.     Despite the terms of the Asset Purchase Agreement and the TSA, Defendants have claimed entitlement to possession, use, license, or ownership of the "Epic EMR Instance"

KCP-4334879

and other of SCLHS' proprietary expertise and intellectual property, including that which is described in Section 2.4 of the TSA.

26.    By so claiming, Prime has raised uncertainty and insecurity with respect to SCLHS' and Prime's rights and legal relations under the TSA and with respect to SCLHS' proprietary expertise and intellectual property, including but not limited to the Epic EMR Instance.

27.    Because such proprietary expertise and intellectual property are tied to the Services SCLHS provides to assist in the transition of ownership and operation of St. John and Providence Hospitals, and because Prime St. John and Prime Providence operate and manage these two hospitals, Prime St. John and Prime Providence are necessary indispensable parties to this action.

## COUNT I
### (Breach of Contract)

28.    SCLHS incorporates the preceding allegations as if fully set forth herein.

29.    The TSA is a valid, enforceable contract between Prime and SCLHS.

30.    Under the TSA, Prime has a duty to pay SCLHS monthly for Services performed, including Services associated with the Revenue Services Center.

31.    SCLHS has performed all of its obligations under the TSA.

32.    Completion of the billing process, i.e., sending out the bills, is conditioned upon and requires Defendants to undertake certain actions and to cooperate with SCLHS.

33.    By failing or refusing to take such actions, Prime has refused to cooperate and prevented SCLHS from completing the end-to-end billing process by sending out the patient bills.

6

34.    Defendants' actions, failures to act, and lack of cooperation are breaches of the express terms of the TSA, as well as the implied covenant of good faith and fair dealing.

35.    Prime's lack of cooperation and breach of the TSA excuse the condition that bills be sent as a condition of Prime's duty to pay SCLHS under the TSA.

36.    Prime's obligation to pay SCLHS for services provided under the TSA has become absolute, and its payments to SCLHS are due and owing in full.

37.    All conditions precedent to Prime's performance under the TSA have occurred and/or have been excused by reason of Prime's actions, failures to act, breaches, and prevention of performance.

38.    SCLHS has performed Services, including Services associated with the Revenue Services Center, during the Term of the TSA.

39.    Prime has materially breached the TSA by failing and refusing to pay SCLHS as required by the TSA, including, but not limited to, payments for Services associated with the Revenue Services Center.

40.    SCLHS has suffered and continues to suffer harmful injury as a direct result of Prime's breaches.

41.    As a result of Prime's breaches and resulting injury, SCLHS is entitled to recover damages from Prime.

**WHEREFORE,** SCLHS respectfully requests judgment in its favor and against Prime and for damages, in excess of $75,000, in the amount sufficient to fully compensate SCLHS for Prime's breaches, as well as prejudgment interest, post-judgment interest, costs, and for all other relief that the Court deems just and proper.

COUNT II
(Declaratory Judgment; Kan. Stat. Ann. Ch. 60, Art. 17)

7

42.    SCLHS incorporates the preceding allegations as if fully set forth herein.

43.    By refusing payment for certain Services, including Revenue Service Center Services, Prime has raised uncertainty and insecurity with respect to SCLHS' and Prime's rights and legal relations under the TSA for the remainder of its Term.

44.    An actual controversy exists among the parties regarding Prime's ongoing obligation to pay SCLHS under the TSA, as well as the parties' respective rights and obligations regarding performance of Revenue Service Center Services and other rights and obligations under the TSA. SCLHS desires a judicial determination and declaration that SCLHS' obligations under the TSA have been fully performed or excused and that Prime therefore has an obligation to pay for all such Services on time and in full. SCLHS further requests a declaratory judgment regarding the obligations of all Defendants to cooperate in the billing process and other Services required to be performed by SCLHS under the TSA.

45.    A judicial determination pursuant to Kan. Stat. Ann. Ch. 60, Art. 17 is necessary and appropriate at this time. The declaratory judgment sought herein would terminate the uncertainty and insecurity raised by Defendants' actions.

46.    Because the declaratory judgment sought by SCLHS could impact the operations of Prime St. John and Prime Providence, those two entities are necessary and indispensable parties to this action.

**WHEREFORE,** SCLHS respectfully requests the Court enter a declaratory judgment in its favor and against Prime declaring that (i) Prime has materially breached the TSA, (ii) SCLHS' obligations under the TSA have been fully performed or excused and that Prime therefore has an obligation to pay for all such Services on time and in full, (iii) Defendants shall cooperate in the billing process and other Services required to be performed by SCLHS under the

8

TSA, (iv) Defendants pay SCLHS an amount sufficient to fully compensate SCLHS for its reasonable costs incurred in this matter, and (v) for such other and further relief as the Court deems just and proper.

## COUNT III
### (Declaratory Judgment; Kan. Stat. Ann. Ch. 60, Art. 17)

47.     SCLHS incorporates the preceding allegations as if fully set forth herein.

48.     The Asset Purchase Agreement and TSA exclude and limit Defendants' use of, access to, possession of, or ownership of SCLHS' proprietary expertise and intellectual property, including, but not limited to, the Epic EMR Instance.

49.     Defendants are claiming entitlement to use of, access to, possession of, license to, or ownership of SCLHS' proprietary expertise and intellectual property, including the Epic EMR Instance, which exceeds the scope of the Asset Purchase Agreement and TSA.

50.     An actual controversy exists between SCLHS, Prime, Prime St. John and Prime Providence regarding the extent of Defendants' rights under the Asset Purchase Agreement and TSA.

51.     SCLHS desires a judicial determination and declaration that Defendants have no right to use, access, possess, or own any of SCLHS' proprietary expertise and intellectual property, including without limitation the Epic EMR Instance, except as expressly permitted by SCLHS in the TSA.

52.     A judicial determination pursuant to Kan. Stat. Ann. Ch. 60, Art. 17 is necessary and appropriate at this time.  The declaratory judgment sought herein would terminate the uncertainty and insecurity raised by Defendants' actions.

**WHEREFORE,** SCLHS respectfully requests the Court enter (i) a declaratory judgment in its favor and against Defendants declaring that Defendants have no right to use, access,

9

possess, license, or own any of SCLHS' proprietary expertise and intellectual property, including, but not limited to, the Epic EMR Instance, except as expressly permitted by SCLHS in the TSA and (ii) an order requiring Defendants to pay SCLHS an amount sufficient to fully compensate SCLHS for its reasonable costs incurred in this matter, and (iii) for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

SCLHS hereby demands a trial by jury for all issues so triable.

Respectfully submitted,

HUSCH BLACKWELL LLP

Jeffrey A. Simon          KS # 15231
Michael S. Hargens        KS # 20689
Judd M. Treeman           KS # 25778
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000
(816) 983-8080 (FAX)
jeff.simon@huschblackwell.com
michael.hargens@huschblackwell.com
judd.treeman@huschblackwell.com

*Attorneys for Plaintiff Sisters of Charity of Leavenworth Health Services, Inc.*

10

KCP-4334879

IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS
CIVIL DIVISION

FILED
LEAVENWORTH CO. KS

2013 JUN 21 PM 1:55

CLERK OF DIST COURT

| | |
|---|---|
| SISTERS OF CHARITY OF<br>LEAVENWORTH HEALTH SYSTEM, INC., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )   Case No. 2013 CV 271<br>) |
| PRIME HEALTHCARE SERVICES, INC.;<br>PRIME HEALTHCARE SERVICES -<br>SAINT JOHN LEAVENWORTH, LLC; and<br>PRIME HEALTHCARE<br>SERVICES – PROVIDENCE, LLC, | )   JURY TRIAL DEMANDED<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## SUMMONS

To:   **PRIME HEALTHCARE SERVICES, INC.**
Registered Agent Kansas, Ltd.
10851 Mastin Blvd. Suite 1000
Overland Park, Kansas 66210

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, at the following address:

Jeffrey J. Simon
Michael S. Hargens
Judd M. Treeman
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112

If you fail to file an answer or motion as described above, judgment by default will be entered against you for the relief demanded in the petition. You also must file your answer or motion with the court.

If you file an answer, any related claim which you may have against the plaintiff must be stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from making such claim in any other action.

Date 6-21-13

Clerk's Seal

KCP-4335104-1

Clerk of the District Court.

By Marylu C
Deputy

## RETURN ON SERVICE OF SUMMONS

I hereby certify that I served a copy of this summons and a copy of the petition on **PRIME HEALTHCARE SERVICES, INC.** (hereinafter "Defendant") in the following manner:

**Personal service** – on the 21ˢᵗ day of June, 2013 at 4:38 p.m. by personally visiting the location of Defendant's registered agent, Registered Agent Kansas, Ltd., 10851 Mastin Blvd., Suite 1000 (10th floor), Overland Park, Kansas (hereinafter, "Registered Agent"), where I personally handed the summons and petition to a person who identified herself to me as Margaret Elliott, who identified herself as having the authority to accept service of process on behalf of Defendant for Registered Agent, and who did in fact accept such service on behalf of Defendant.

---

## AFFIDAVIT OF SERVICE

STATE OF MISSOURI    )
                     ) ss.
COUNTY OF JACKSON   )

I, Judd M. Treeman, declare, verify, certify, swear or affirm under penalty of perjury under the laws of the state of Kansas that the foregoing Return on Service of Summons is true and correct.

Executed on June 24, 2013.

Subscribed and sworn to before me this 24th day of June, 2013.

KELLEY C. COX
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires: May 21, 2015
Commission # 11389387

IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS FILED
CIVIL DIVISION                              LEAVENWORTH CO. KS

SISTERS OF CHARITY OF                    )        2013 JUN 21  PM 2: 00
LEAVENWORTH HEALTH SYSTEM, INC.,         )
                                         )        CLERK OF DIST COURT
          Plaintiff,                     )
                                         )
v.                                       )        Case No. 2013CV271
                                         )
PRIME HEALTHCARE SERVICES, INC.;         )        JURY TRIAL DEMANDED
PRIME HEALTHCARE SERVICES –              )
SAINT JOHN LEAVENWORTH, LLC; and         )
PRIME HEALTHCARE                         )
SERVICES – PROVIDENCE, LLC,              )
                                         )
          Defendants.                    )

## SUMMONS

To:   **PRIME HEALTHCARE SERVICES – SAINT JOHN LEAVENWORTH, LLC**
      Through its registered agent
      National Corporate Research, Ltd.
      2101 S.W. 21st Street
      Topeka, Kansas 66604

      A lawsuit has been filed against you.

      Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, at the following address:

          Jeffrey J. Simon
          Michael S. Hargens
          Judd M. Treeman
          Husch Blackwell LLP
          4801 Main Street, Suite 1000
          Kansas City, Missouri 64112

      If you fail to file an answer or motion as described above, judgment by default will be entered against you for the relief demanded in the petition. You also must file your answer or motion with the court.

      If you file an answer, any related claim which you may have against the plaintiff must be stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from making such claim in any other action.

Date _6-21-13_                                    Clerk of the District Court.

Clerk's Seal                                      By _Maylu C_
                                                     Deputy

KCP-4335104-1

## RETURN ON SERVICE OF SUMMONS

I hereby certify that I served a copy of this summons and a copy of the petition on **PRIME HEALTHCARE SERVICES – SAINT JOHN LEAVENWORTH, LLC** (hereinafter "Defendant") in the following manner:

**Personal service** – on the 21st day of June, 2013 at 3:23 p.m. by personally visiting the location of Defendant's registered agent, National Corporate Research, Ltd. 2101 S.W. 21st Street, Topeka, Kansas (hereinafter, "Registered Agent"), where I personally handed the summons and petition to a person who identified herself to me as Diane Schafer, who identified herself as having the authority to accept service of process on behalf of Defendant for Registered Agent, and who did in fact accept such service on behalf of Defendant.

## AFFIDAVIT OF SERVICE

STATE OF MISSOURI    )
                         ) ss.
COUNTY OF JACKSON   )

I, Judd M. Treeman, declare, verify, certify, swear or affirm under penalty of perjury under the laws of the state of Kansas that the foregoing Return on Service of Summons is true and correct.

Executed on June 24, 2013.

Subscribed and sworn to before me this 24th day of June, 2013.

KELLEY C. COX
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires: May 21, 2015
Commission # 11389387

FILED
LEAVENWORTH CO. KS

**IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS**
**CIVIL DIVISION**

2013 JUN 21  PM 2: 00

℃ CLERK OF DIST COURT

SISTERS OF CHARITY OF                    )
LEAVENWORTH HEALTH SYSTEM, INC.,         )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )     Case No. 2013 C V 271
                                         )
PRIME HEALTHCARE SERVICES, INC.;         )     **JURY TRIAL DEMANDED**
PRIME HEALTHCARE SERVICES –              )
SAINT JOHN LEAVENWORTH, LLC; and         )
PRIME HEALTHCARE                         )
SERVICES – PROVIDENCE, LLC,              )
                                         )
          Defendants.                    )

## SUMMONS

To:   **PRIME HEALTHCARE SERVICES – PROVIDENCE, LLC**
      Through its registered agent
      National Corporate Research, Ltd.
      2101 S.W. 21st Street
      Topeka, KS 66604

A lawsuit has been filed against you.

      Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, at the following address:

            Jeffrey J. Simon
            Michael S. Hargens
            Judd M. Treeman
            Husch Blackwell LLP
            4801 Main Street, Suite 1000
            Kansas City, Missouri 64112

      If you fail to file an answer or motion as described above, judgment by default will be entered against you for the relief demanded in the petition. You also must file your answer or motion with the court.

      If you file an answer, any related claim which you may have against the plaintiff must be stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from making such claim in any other action.

Date  **6-21-13**                        Clerk of the District Court.

Clerk's Seal                             By  _Maryke C_____
                                             Deputy

KCP-4335104-1

## RETURN ON SERVICE OF SUMMONS

I hereby certify that I served a copy of this summons and a copy of the petition on **PRIME HEALTHCARE SERVICES – PROVIDENCE, LLC** (hereinafter "Defendant") in the following manner:

**Personal service** – on the 21st day of June, 2013 at 3:23 p.m. by personally visiting the location of Defendant's registered agent, National Corporate Research, Ltd. 2101 S.W. 21st Street, Topeka, Kansas (hereinafter, "Registered Agent"), where I personally handed the summons and petition to a person who identified herself to me as Diane Schafer, who identified herself as having the authority to accept service of process on behalf of Defendant for Registered Agent, and who did in fact accept such service on behalf of Defendant.

## AFFIDAVIT OF SERVICE

STATE OF MISSOURI )
                      ) ss.
COUNTY OF JACKSON )

I, Judd M. Treeman, declare, verify, certify, swear or affirm under penalty of perjury under the laws of the state of Kansas that the foregoing Return on Service of Summons is true and correct.

Executed on June 24, 2013.

Subscribed and sworn to before me this 24th day of June, 2013.

KELLEY C. COX
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires: May 21, 2015
Commission # 11389387

KCP-4325639-1

# Leavenworth County District Court Search - Case Display

## Case Number: 271

| | |
|---|---|
| Case Year: 2013 | **Case UID**: 2013-CV-000271 |
| Case Type: CV | Filed: 2013-06-21 |
| Case Sub-type: Other Contract | |
| Advisement Date: | Remand Date: |
| Appealed: N | Appealed Date: |
| Status Code: 1 | Status Date: |
| Status Description: Pending | |

## Defendants

### Party 1

| |
|---|
| Defendant Number: 1 |

| | | |
|---|---|---|
| Last Name (or Business Name): Prime Healthcare Services Inc | | |
| First Name: | Middle: | **Suffix**: |

### Description

| | |
|---|---|
| Sex: | Race: |
| Height: | Weight: |

### Defense Attorney 1

| | | |
|---|---|---|
| Last Name: Tideman | First: Curtis | Middle: L |
| Primary Attorney: Y | Court Appointed: N | Conflict Attorney: N |
| Withdrawn: N | Send Notices: Y | |
| Practice or Office: Lathrop & Gage | | |

### Party 2

| |
|---|
| Defendant Number: 2 |

**EXHIBIT 2**

| Last Name (or Business Name): Prime Healthcare Services - St John Hospital | | |
|---|---|---|
| First Name: | Middle: | **Suffix**: |

## Description

| Sex: | Race: |
|---|---|
| Height: | Weight: |

## Defense Attorney 1

| Last Name: Tideman | First: Curtis | Middle: L |
|---|---|---|
| Primary Attorney: Y | Court Appointed: N | Conflict Attorney: N |
| Withdrawn: N | Send Notices: Y | |
| Practice or Office: Lathrop & Gage | | |

## Party 3

| Defendant Number: 3 |
|---|

| Last Name (or Business Name): Prime Healthcare Services - Providence LLC | | |
|---|---|---|
| First Name: | Middle: | **Suffix**: |

## Description

| Sex: | Race: |
|---|---|
| Height: | Weight: |

## Defense Attorney 1

| Last Name: Tideman | First: Curtis | Middle: L |
|---|---|---|
| Primary Attorney: Y | Court Appointed: N | Conflict Attorney: N |
| Withdrawn: N | Send Notices: Y | |
| Practice or Office: Lathrop & Gage | | |

# Plaintiff

## Party

| Plaintiff Number: 1 | Amount Claimed: 0.00 |
|---|---|

| Last Name (or Business Name): Sisters of Charity of Leavenworth Health System | | |
|---|---|---|
| First Name: | Middle: | Suffix: |

## Description

| Sex: | Race: |
|---|---|
| Height: | Weight: |

## Plaintiff Attorney

| Last Name: Simon | First: Jeffrey | Middle: J |
|---|---|---|
| Primary Attorney: Y | Court Appointed: N | Conflict Attorney: N |
| Withdrawn: N | Send Notices: Y | |
| Practice or Office: Husch Blackwell LLP | | |

# Case Judge

| Last Name: King | First: David | Middle: J | Suffix: |
|---|---|---|---|

# Registry of Actions

### Action 1

| Action Date: 2013-06-21 | Action Type: CRCV |
|---|---|
| Action Agent: David J King | |
| Description: The record of all proceedings in this case are digitally recorded unless otherwise noted. | |

### Action 2

| Action Date: 2013-06-21 | Action Type: |
|---|---|
| Action Agent: David J King | |
| Description: Filing: Civil Docket Fee Paid by: Jeff Simon Receipt number: 0181168 Dated: 6/21/2013 Amount: $178.00 (Check) For: Sisters Of Charity Of Leavenworth Health System (p | |

### Action 3

| Action Date: 2013-06-21 | Action Type: AOR |
|---|---|
| Action Agent: David J King | |

| Description: Plaintiff: Sisters of Charity of Leavenworth Health System Attorney of Record Jeffrey J Simon |
| --- |

## Action 4

| Action Date: 2013-06-21 | Action Type: ISSD |
| --- | --- |
| Action Agent: David J King | |
| Description: SUMMONS: Issued to Prime Healthcare Services Inc on 6/21/2013; Assigned to JO, Johnson County Sheriff. 10851 Mastin Blvd Overland Park KS | |

## Action 5

| Action Date: 2013-06-21 | Action Type: ISSD |
| --- | --- |
| Action Agent: David J King | |
| Description: SUMMONS: Issued to Prime Healthcare Services - St John Hospital on 6/21/2013; Assigned to ATTY, Attorney. | |

## Action 6

| Action Date: 2013-06-21 | Action Type: ISSD |
| --- | --- |
| Action Agent: David J King | |
| Description: SUMMONS: Issued to Prime Healthcare Services - Providence LLC on 6/21/2013; Assigned to ATTY, Attorney. | |

## Action 7

| Action Date: 2013-06-21 | Action Type: PET |
| --- | --- |
| Action Agent: David J King | |
| Description: Petition Document title: PETITION PURSUANT TO K.S.A. CHAPTER 60 Document # 1053891 indexed to this case | |

## Action 8

| Action Date: 2013-06-21 | Action Type: REQ |
| --- | --- |
| Action Agent: David J King | |
| Description: Request Document title: REQUEST FOR SERVICE Document # 1053892 indexed to this case | |

## Action 9

| Action Date: 2013-06-25 | Action Type: SERVED |
|---|---|
| Action Agent: David J King | |
| Description: SUMMONS: Served to Prime Healthcare Services Inc on 6/24/2013; Assigned to ATTY, Attorney. Document title: SUMMONS served Prime Healthcare Services Inc Document # 1053738 indexed to this case | |

## Action 10

| Action Date: 2013-06-25 | Action Type: SERVED |
|---|---|
| Action Agent: David J King | |
| Description: SUMMONS: Served to Prime Healthcare Services - St John Hospital on 6/24/2013; Assigned to ATTY, Attorney. Document title: SUMMONS served Prime Healthcare Services - St John Leavenworth Document # 1053739 indexed to this case | |

## Action 11

| Action Date: 2013-06-25 | Action Type: SERVED |
|---|---|
| Action Agent: David J King | |
| Description: SUMMONS: Served to Prime Healthcare Services - Providence LLC on 6/24/2013; Assigned to ATTY, Attorney. Document title: SUMMONS served Prime Healthcare Services - Providence Document # 1053740 indexed to this case | |

## Action 12

| Action Date: 2013-06-27 | Action Type: |
|---|---|
| Action Agent: David J King | |
| Description: Email Sent Date: 06/27/2013 12:21 pm To: jeff.simon@huschblackwell.com File Attached: SUMMONSSERVEDPRIMEHEALTHCARESERVICES-STJOHNLEAVENWORTH.pdf Name of Document: SUMMONS served Prime Healthcare Services - St John Leavenworth | |

## Action 13

| Action Date: 2013-06-27 | Action Type: |
|---|---|
| Action Agent: David J King | |
| Description: Email Sent Date: 06/27/2013 12:22 pm To: jeff.simon@huschblackwell.com File Attached: SUMMONSSERVEDPRIMEHEALTHCARESERVICES-PROVIDENCE.pdf Name of Document: SUMMONS served Prime Healthcare Services - Providence | |

Office of Judicial Administration - Kansas District Court Records Search                                         Page 6 of 7

## Action 14

| Action Date: 2013-06-28 | Action Type: EOA |
|---|---|
| Action Agent: David J King | |
| Description: Entry of Appearance Document title: ENTRY OF APPEARANCE Document # 1056235 indexed to this case | |

## Action 15

| Action Date: 2013-06-28 | Action Type: AOR |
|---|---|
| Action Agent: David J King | |
| Description: Defendant: Prime Healthcare Services Inc Attorney of Record Curtis L Tideman | |

## Action 16

| Action Date: 2013-07-11 | Action Type: |
|---|---|
| Action Agent: David J King | |
| Description: Email Sent Date: 07/11/2013 09:46 am To: dschanker@lathropgage.com File Attached: SUMMONSSERVEDPRIMEHEALTHCARESERVICESINC.pdf Name of Document: SUMMONS served Prime Healthcare Services Inc | |

## Action 17

| Action Date: 2013-07-11 | Action Type: |
|---|---|
| Action Agent: David J King | |
| Description: Email Sent Date: 07/11/2013 09:46 am To: dschanker@lathropgage.com File Attached: SUMMONSSERVEDPRIMEHEALTHCARESERVICES-STJOHNLEAVENWORTH.pdf Name of Document: SUMMONS served Prime Healthcare Services - St John Leavenworth | |

## Action 18

| Action Date: 2013-07-11 | Action Type: |
|---|---|
| Action Agent: David J King | |
| Description: Email Sent Date: 07/11/2013 09:46 am To: dschanker@lathropgage.com File Attached: SUMMONSSERVEDPRIMEHEALTHCARESERVICES-PROVIDENCE.pdf Name of Document: SUMMONS served Prime Healthcare Services - Providence | |

## Action 19

| Action Date: 2013-07-11 | Action Type: MOT |
|---|---|

| Action Agent: David J King |
|---|
| Description: Motion Document title: DEFENDANTS' MOTION FOR RULE 113 CLERK'S EXTENSION Document # 1059072 indexed to this case |

## Action 20

| Action Date: 2013-07-11 | Action Type: EXT |
|---|---|
| Action Agent: David J King | |
| Description: Clerk's 14 Day Extension of Time Document title: ORDER GRANTING RULE 113 CLERK'S EXTENSION Document # 1059682 indexed to this case | |

## Action 21

| Action Date: 2013-07-11 | Action Type: AOR |
|---|---|
| Action Agent: David J King | |
| Description: Defendant: Prime Healthcare Services - St John Hospital Attorney of Record Curtis L Tideman | |

## Action 22

| Action Date: 2013-07-11 | Action Type: AOR |
|---|---|
| Action Agent: David J King | |
| Description: Defendant: Prime Healthcare Services - Providence LLC Attorney of Record Curtis L Tideman | |

## Action 23

| Action Date: 2013-07-12 | Action Type: |
|---|---|
| Action Agent: David J King | |
| Description: Email Sent Date: 07/12/2013 08:47 am To: ctideman@latrhopgage.com File Attached: ORDERGRANTINGRULE113CLERK'SEXTENSION.pdf Name of Document: ORDER GRANTING RULE 113 CLERK'S EXTENSION | |

© 2013 **Office of Judicial Administration (http://www.kscourts.org)**

### IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS
### CIVIL DIVISION

| | | |
|---|---|---|
| SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM, INC., | ) ) ) | Case No. 2013-CV-271 |
| | ) | Chapter 60 |
| Plaintiff, | ) ) | |
| | ) | |
| PRIME HEALTHCARE SERVICES, INC.; | ) | **FAX FILE** |
| PRIME HEALTHCARE SERVICES-SAINT | ) | |
| JOHN LEAVENWORTH, LLC; and | ) | |
| PRIME HEALTHCARE | ) | |
| SERVICES-PROVIDENCE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### ENTRY OF APPEARANCE

Curtis L. Tideman of the law firm Lathrop & Gage LLP, hereby enters his appearance as primary counsel on behalf defendant, Prime Healthcare Services, Inc., in the above-entitled cause. Matthew K. Corbin and Mark A. Samsel also of the law firm Lathrop & Gage LLP, hereby enters their appearance as additional counsel on behalf of defendant, Prime Healthcare Services, Inc., in the above-entitled cause.

Copies of all future pleadings, correspondence, and/or any other documents relating in any way to the above-entitled action should be directed to the undersigned counsel.

Respectfully submitted,

LATHROP & GAGE LLP

By: _____

Curtis L. Tideman    KS Bar #13453
Building 82, Suite 1000
10851 Mastin Blvd.
Overland Park, KS 66210-1669
(913) 451-5100  Fax: (913) 451-0875
ctideman@lathropgage.com

20462418v1

**EXHIBIT 3**

LATHROP & GAGE LLP

By: _____

      Matthew K. Corbin    KS Bar #21321
      Building 82, Suite 1000
      10851 Mastin Blvd.
      Overland Park, KS  66210-1669
      (913) 451-5100  Fax: (913) 451-0875
      mcorbin@lathropgage.com


LATHROP & GAGE LLP

By: _____

      Mark A. Samsel    KS Bar #24551
      Building 82, Suite 1000
      10851 Mastin Blvd.
      Overland Park, KS  66210-1669
      (913) 451-5100  Fax: (913) 451-0875
      msamsel@lathropgage.com

**ATTORNEYS FOR DEFENDANT
PRIME HEALTHCARE SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by United States Mail, first class, postage prepaid, on this 28th day of June, 2013, upon the following:

Jeffrey J. Simon
Michael S. Hargens
Judd M. Treeman
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO  64112

Tel: 816.983.8000
Fax:  816.983.8080
Jeff.simon@huschblackwell.com
Michael.hargens@huschblackwell.com
Judd.treeman@huschblackwell.com

**Attorneys for Plaintiff**

Curtis L. Tideman

**FACSIMILE TRANSMISSION COVER SHEET**
**Form for Rule 119(d)(3)**

**DATE:**    June 28, 2013

**TO:**    Clerk of the District Court, Leavenworth County

FAX Number: 1-913-684-0492

**Case Number: 2013-CV-271**

Caption:    *Sisters of Charity of Leavenworth Health System, Inc. vs.*
*Prime Healthcare Services, Inc.,; Prime Healthcare*
*Services—Saint John Leavenworth, LLC; and Prime*
*Healthcare Services—Providence, LLC*

**FROM:**    Attorney:    Curtis L. Tideman
Lathrop & Gage LLP
10851 Mastin Boulevard
Building 82, Suite 1000
Overland Park, Kansas 66210

Kansas Supreme Court Registration Number: 13433

Telephone Number: (913) 451-5100

Fax Number: (913) 451-0875

Attorneys for:  Defendant Prime Healthcare Services, Inc.

1.    Please file the following transmitted document.  NOTE:  Document length is
limited to 10 pages.  A cover sheet must separate each document filed.

| <u>Document Name</u> | <u>No. of Pages</u> (including cover) |
|---|---|
| **ENTRY OF APPEARANCE** | **4** |

```
         ***********************
         ***   TX REPORT   ***
         ***********************

  TRANSMISSION OK

  TX/RX NO             3091
  RECIPIENT ADDRESS    819136840492
  DESTINATION ID
  ST. TIME             06/28 15:06
  TIME USE             02'03
  PAGES SENT           4
  RESULT               OK
```

*FAXED FILED*

# FACSIMILE TRANSMISSION COVER SHEET
## Form for Rule 119(d)(3)

**DATE:**     June 28, 2013

**TO:**       Clerk of the District Court, Leavenworth County

FAX Number: 1-913-684-0492

**Case Number: 2013-CV-271**

Caption:    *Sisters of Charity of Leavenworth Health System, Inc. vs.*
            *Prime Healthcare Services, Inc.,; Prime Healthcare*
            *Services—Saint John Leavenworth, LLC; and Prime*
            *Healthcare Services—Providence, LLC*

**FROM:**    Attorney:    Curtis L. Tideman
                          Lathrop & Gage LLP
                          10851 Mastin Boulevard
                          Building 82, Suite 1000
                          Overland Park, Kansas 66210

                          Kansas Supreme Court Registration Number: 13433

                          Telephone Number: (913) 451-5100

                          Fax Number: (913) 451-0875

                          Attorneys for: Defendant Prime Healthcare Services, Inc.

1.    Please file the following transmitted document. NOTE: Document length is
      limited to 10 pages. A cover sheet must separate each document filed.

**Document Name**                                   **No. of Pages**
                                                    (including cover)

**ENTRY OF APPEARANCE**                                 4

IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS

FILED
LEAVENWORTH CO. KS
2013 JUL 11 AM 10: 20
CLERK OF DIST COURT

| | |
|---|---|
| SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM, INC. | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| PRIME HEALTHCARE SERVICES, INC. et al., | ) ) ) |
| Defendants. | ) |

Case No. 2013-CV-271
Division 4

K.S.A. Chapter 60

## DEFENDANTS' MOTION FOR RULE 113 CLERK'S EXTENSION

Defendants, Prime Healthcare Services, Inc., Prime Healthcare Services - Saint John Leavenworth, LLC, and Prime Healthcare Services - Providence, LLC (collectively, "Defendants"), pursuant to Kansas Supreme Court Rule ("Rule") 113, hereby move the Clerk to enter an Order granting Defendants a **14-day extension** of time, up to and including July 29, 2013, in which to answer or otherwise respond to the Petition Pursuant to K.S.A. Chapter 60 (the "Petition") filed by Plaintiff, Sisters of Charity of Leavenworth Health System, Inc. ("SCLHS"), on June 21, 2013 in this action. In support of this motion, Defendants state:

1.      Upon information and belief, SCLHS served each of the Defendants with a copy of a Summons and the Petition for the above-styled action on June 24, 2013. Thus, Defendants must presently answer or otherwise respond to the Petition on or before July 15, 2013. *See* K.S.A. 60-212(a).

2.      Rule 113 permits the Clerk of the Court to extend the initial time for Defendants to answer or otherwise respond to the Petition for a period of time not to exceed 14 days.

3.      Pursuant to Rule 113, Defendants hereby request a 14-day extension of time in which to answer or otherwise respond to the Petition.

**EXHIBIT 4**

4.     Defendants' time for responding to the Petition has not yet expired, and this request is submitted in the interests of justice and not for any improper purpose.

5.     By filing this motion, Defendants expressly reserve and do not waive any rights, objections, or defenses that may be available to them in this Court.

6.     In compliance with Rule 113, a proposed Order is attached hereto.

WHEREFORE, Defendants, Prime Healthcare Services, Inc., Prime Healthcare Services - Saint John Leavenworth, LLC, and Prime Healthcare Services - Providence, LLC, request that the Clerk of the Court enter an Order granting them a 14-day extension of time, up to and including July 29, 2013, in which to answer or otherwise respond to the Petition.

Respectfully submitted,

LATHROP & GAGE LLP

By: _____
      Curtis L. Tideman, KS #13433
      ctideman@lathropgage.com
      Matthew K. Corbin, KS #21321
      mcorbin@lathropgage.com
      Mark A. Samsel, KS #24551
      msamsel@lathropgage.com
      10851 Mastin Blvd., Suite 1000
      Overland Park, KS  66210-1669
      Telephone: (913) 451-5100
      Telecopier: (913) 451-0875

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was served by first-class, United States mail, postage-prepaid, on this 10th day of July, 2013, to the following counsel of record:

Mr. Jeffrey J. Simon
jeff.simon@huschblackwell.com
Mr. Michael S. Hargens
michael.hargens@huschblackwell.com
Mr. Judd M. Treeman
judd.treeman@huschblackwell.com
Husch Blackwell LLP
4801 Main St., Suite 1000
Kansas City, MO  64112

Attorneys for Plaintiff

_____
An Attorney for Defendants

**IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS**

FILED
LEAVENWORTH CO. KS
2013 JUL 11 PM 4: 45
CLERK OF DIST COUR

| | | |
|---|---|---|
| SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM, INC. | ) ) ) | Case No. 2013-CV-271 Division 4 |
| Plaintiff, | ) ) ) | K.S.A. Chapter 60 |
| v. | ) ) | |
| PRIME HEALTHCARE SERVICES, INC. et al., | ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING RULE 113 CLERK'S EXTENSION

Upon consideration of Defendants' Motion for Rule 113 Clerk's Extension, Defendants, Prime Healthcare Services, Inc., Prime Healthcare Services - Saint John Leavenworth, LLC, and Prime Healthcare Services - Providence, LLC, are granted a 14-day extension of time, up to and including July 29, 2013, in which to file an answer or otherwise respond to Plaintiff's Petition Pursuant to K.S.A. Chapter 60.

Dated: __7-11-13__

_____
Clerk of the Court

Submitted by:

LATHROP & GAGE LLP

_____
Curtis L. Tideman, KS #13433
ctideman@lathropgage.com
Matthew K. Corbin, KS #21321
mcorbin@lathropgage.com
Mark A. Samsel, KS #24551
msamsel@lathropgage.com
10851 Mastin Blvd., Suite 1000
Overland Park, KS  66210-1669
Telephone: (913) 451-5100
Telecopier: (913) 451-0875

ATTORNEYS FOR DEFENDANTS

20491632v1

## IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS
## CIVIL DIVISION

SISTERS OF CHARITY OF                        )
LEAVENWORTH HEALTH SYSTEM, INC.,             )
                                             )
      Plaintiff,                       )    Case No. 2013-CV-271
                                             )
    v.                                      )
                                             )
PRIME HEALTHCARE SERVICES,                   )
INC., et al.,                                )
                                             )
      Defendants.                      )

## <u>NOTICE OF FILING OF NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE that Defendants, Prime Healthcare Services, Inc., Prime Healthcare Services - Saint John Leavenworth, LLC, and Prime Healthcare Services - Providence, LLC, by and through their counsel, and pursuant to 28 U.S.C. § 1446(d), have filed in the United States District Court for the District of Kansas (at Kansas City), a Notice of Removal of the above-captioned case. The original of the attached **Exhibit A** (Notice of Removal) was filed in the United States District Court for the District of Kansas (at Kansas City) on this 19th day of July, 2013. Pursuant to 28 U.S.C. § 1446(d), this Notice "shall effect the removal and the State court shall proceed no further unless and until the case is remanded."

**EXHIBIT 5**

LATHROP & GAGE LLP

By: _____

Curtis L. Tideman, KS #13433
Mark A. Samsel, KS #24551
10851 Mastin Boulevard, Suite 1000
Overland Park, Kansas 66210-1669
Telephone:  (913) 451-5100
Telecopier:  (913) 451-0875
ctideman@lathropgage.com
msamsel@lathropgage.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served by first-class, United States mail, postage prepaid, on the following counsel of record on this 19th day of July, 2013:

Mr. Jeffrey J. Simon
Mr. Michael S. Hargens
Mr. Judd M. Treeman
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Jeff.simon@huschblackwell.com
Michael.Hargens@huschblackwell.com
Judd.Treeman@huschblackwell.com

ATTORNEYS FOR PLAINTIFF

_____
An Attorney for Defendants

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Sisters of Charity of Leavenworth Health Systems, Inc. | Prime Healthcare Services, Inc., Prime Healthcare Services-Saint John Leavenworth, LLC and Prime Healthcare Services-Providence, LLC |

| (b) County of Residence of First Listed Plaintiff **Denver County, CO** | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Jeffrey J. Simon, Michael S. Hargens, Judd M. Treeman, Husch Blackwell LLP, 4801 Main Street, Ste. 1000, Kansas City, MO 64112; Telephone (816) 983-8000 | Curtis L. Tideman, Mark A. Samsel, Lathrop & Gage LLP, 10851 Mastin Blvd., Ste. 1000, Overland Park, KS 66213; Telephone (913) 451-5100 |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander   Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability   ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine   Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product   Liability | | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☒ 190 Other Contract | Product Liability   ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury -   Product Liability | Leave Act | | Act |
| | Medical Malpractice | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other   ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332 and 1441

Brief description of cause:
BREACH OF CONTRACT

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.    DEMAND $ 75,000 +    CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**EXHIBIT 6**

## TRANSITION SERVICES AGREEMENT

This **TRANSITION SERVICES AGREEMENT** (this "Agreement") is entered into effective as of April 1, 2013 (such date being the "Effective Date"), by and between Sisters of Charity of Leavenworth Health System, Inc., a Kansas not-for-profit corporation ("SCLHS"), and Prime Healthcare Services, Inc., a Delaware corporation ("Purchaser"). SCLHS and Purchaser are sometimes referred to individually as a "Party" and collectively as the "Parties." Capitalized terms not defined herein shall have the meaning as set forth in the Purchase Agreement.

**WHEREAS,** Purchaser, SCLHS, Providence Medical Center, Inc., a Kansas not-for-profit corporation ("PMC"), and Saint John Hospital, Inc., a Kansas not-for-profit corporation ("SJL") and, together with PMC and SCLHS, the "Seller Parties") entered into that certain Asset Purchase Agreement dated as of January 18, 2013, as amended (the "Purchase Agreement"), whereby Purchaser agreed to purchase certain assets and assume certain liabilities used in the provision of healthcare services by the Seller Parties (such assets and liabilities being the "Purchased Operations;" and such purchase and assumption being the "Transaction"); and

**WHEREAS,** the Parties desire to provide for certain transition services to assist in the transition of ownership and continuity of the Purchased Operations;

**NOW, THEREFORE,** the Parties agree as follows:

## ARTICLE I
## SCOPE OF AGREEMENT

### 1.1    Scope of Agreement; Relationship of Parties

(a)    This Agreement defines certain Services (defined below) to be provided by SCLHS to Purchaser during the Term (as defined below), and the costs and fees to be paid by Purchaser for such Services.

(b)    The relationship between SCLHS and Purchaser under this Agreement is that of independent contractors. Nothing contained in this Agreement or otherwise shall be construed to constitute or create a partnership, agency relationship, joint venture, equity interest or lease between SCLHS and Purchaser. No Party has the power or authority to act on behalf of any other Party, except as expressly set forth in this Agreement, or as authorized in writing by the other Party.

### 1.2    Purchased Operations.

As of the Effective Date, Purchaser shall have the exclusive and ultimate responsibility for the management of all of the Purchased Operations and shall have the ultimate authority and control over same, it being acknowledged that SCLHS and Purchaser shall comply with applicable policies and procedures of each other related to the Services (as defined below).

EXHIBIT 7

## ARTICLE II
## DUTIES OF PURCHASER

**2.1   Services.**   During the Term, SCLHS shall provide the services described in Exhibit A of this Agreement (all, collectively, the "Services," and each, individually, a "Service").   SCLHS may provide the Services through subcontractors which either (a) are SCLHS affiliates or (b) are not SCLHS affiliates but provide such Services to any of the Seller Parties as of the date of this Agreement.   From time to time, Purchaser may request additional services of SCLHS.   Such additional services and corresponding fees shall be mutually agreed to by the Parties at which time such services shall be included as Services under this Agreement.   In consideration for the Services provided hereunder by SCLHS, Purchaser shall pay SCLHS the amounts set forth in Exhibit B to the Agreement.

**2.2   Disengagement.**   In the event that this Agreement terminates or expires for any reason (other than as a result of an occurrence of an Event of Default with respect to Purchaser) or Purchaser elects to terminate one or more of the Services pursuant to Section 5.4(b) of this Agreement, Purchaser may request that SCLHS provide specific disengagement services in connection with the termination of one or more of the Services being terminated, and upon such request, (a) SCLHS and Purchaser shall agree upon the timeline and cost of Disengagement Activities (as defined in Exhibit C), which shall be incorporated into a Disengagement Plan (as defined in Exhibit C) signed by the Parties; and (b) SCLHS shall provide and Purchaser shall receive such disengagement services in accordance with such Disengagement Plan and with the terms and conditions of Exhibit C. If the Parties are unable to agree to a Disengagement Plan with respect to any Disengagement Activities or other disengagement services, then SCLHS will provide reasonable assistance to Purchaser for such other disengagement services at the sole expense of Purchaser and at reasonable rates charged by SCLHS.   If Purchaser does not require Disengagement Activities or other disengagement services, but SCLHS provides assistance as part of the disengagement process, then Purchaser shall pay all costs or fees reasonably incurred by SCLHS (or any third parties used by SCLHS) as part of such process.   Upon any termination or expiration of this Agreement or termination of one or more of the Services provided under this Agreement (by Purchaser or otherwise), SCLHS shall in no way be liable or obligated to Purchaser to perform Disengagement Activities or other disengagement services, to terminate Services in an orderly manner, or for any damages or losses suffered by Purchaser as a result of a lack of such Disengagement Activities or other disengagement services or such orderly termination, unless SCLHS and Purchaser have mutually agreed that SCLHS will provide Disengagement Activities pursuant to this Section 2.2 and Exhibit C or other disengagement services.   SCLHS will offer such Disengagement Activities pursuant to this Section 2.2 and Exhibit C or other disengagement services, which may include mutually agreed to Disengagement Activities, other disengagement services, or data transfers, but in no event shall such services or transfers include delivery or assignment of, or license to, SCLHS IP (as defined herein) or other content, or other third-party content or intellectual property.   Purchaser acknowledges and agrees that SCLHS shall not be obligated to provide Disengagement Activities or other disengagement services beyond the Term (as defined herein).   Purchaser acknowledges and agrees that SCLHS may use third party contractors or agents pursuant to a Disengagement Plan or in the provision of other disengagement services.

**2.3    Disaster Recovery.**    From and after Closing (as defined in Section 5.1), Purchaser shall be solely responsible for designing, implementing and the results of a disaster recovery plan for the Purchased Operations applicable in the event Services are interrupted or terminated for any reason ("Disaster Recovery Services"); provided that SCLHS shall be responsible for providing Disaster Recovery Services for the Purchased Operations if such Disaster Recovery Services are one of the Services listed on Exhibit A, provided further that SCLHS shall only be responsible for Disaster Recovery Services within SCLHS systems and data centers.

**2.4    Non-Transfer of SCLHS IP.**    SCLHS and its affiliates have incurred substantial time and expense in the development of proprietary expertise and intellectual property which may be used in the provision of Services, including without limitation order sets and other licensee-definable aspects of the Epic EMR instance in place for the Purchased Operations (collectively, "SCLHS IP"). While SCLHS IP will of necessity be used in the provision of Services, Purchaser shall have no right to SCLHS IP beyond its limited, non-transferable license to such SCLHS IP in Purchaser's use of Services. As Services expire or are terminated, Purchaser shall have no further right to SCLHS IP and shall return or destroy all software and other embodiments of SCLHS IP and shall certify to SCLHS such return or destruction, from time to time as SCLHS may reasonably request.  Except as permitted under the terms of this Agreement, Purchaser will not and will not permit others to (a) reverse engineer, decompile, decode, decrypt, disassemble, or in any way derive source code from, the SCLHS IP, (b) modify, translate, adapt, alter, or create derivative works of the SCLHS IP, (c) copy, distribute, publicly display, transmit, sell, rent, lease or otherwise exploit the SCLHS IP, (d) grant unauthorized third party access to the SCLHS IP, or (e) do any act that would or might invalidate or be inconsistent with SCLHS' rights in the SCLHS IP.

**2.5    Standard of Services.**    SCLHS shall provide the Services during the Term in a manner materially consistent with the level of such Services provided by SCLHS to the Purchased Operations prior to Closing and materially meeting SCLHS' recent historical practice, using reasonable care and diligence; provided that SCLHS shall not be liable for failures or actions of third parties, including IT system licensors.  NO OTHER WARRANTIES ARE PROVIDED, AND SCLHS HEREBY DISCLAIMS ANY IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  NO WARRANTY OF ANY KIND IS GIVEN WITH RESPECT TO ANY INFORMATION TECHNOLOGY, INCLUDING SOFTWARE SYSTEMS, PROVIDED BY OTHER PARTIES.  EXCEPT AS SET FORTH HEREIN, THE SERVICES ARE PROVIDED BY SCLHS ON AN AS-IS BASIS.

**2.6    System Security.**    In connection with the provision of Services, SCLHS shall provide Purchaser with end-user access to the systems used by SCLHS to provide the Services during the Term to the extent (i) SCLHS has the necessary permissions to provide such access to Purchaser, and (ii) such access is required for Purchaser to provide patient care and conduct business operations; provided, however, that provision of such access to Purchaser by SCLHS shall be in SCLHS' sole discretion.  In no event shall Purchaser directly or indirectly, make, or allow any third party to make, any modification to any component of the SCLHS system, including any portion of the system which has not been segregated for the sole use of Purchaser, or any component of the system used by SCLHS to provide the Services, in each case without

SCLHS' prior written consent.

    2.7    **Payment.**  In consideration for the Services provided hereunder by SCLHS, Purchaser shall pay SCLHS the amount for each Service set forth in Exhibit B to the Agreement. In addition, Purchaser shall be responsible for all out-of-pocket reasonable expenses for travel, lodging and meals incurred by SCLHS in providing the Services to the extent such travel (and incidentally incurred expenses for lodging and meals) is requested by Purchaser or is in the normal course of the Services. Further, Purchaser shall be responsible for reasonable expenses related to time spent by SCLHS personnel in performing the Services. By the fifteenth (15th) day of each month, SCLHS shall send Purchaser an invoice detailing the amount due to SCLHS from Purchaser for the Services and the out-of-pocket expenses, and Purchaser shall pay such invoice in full within thirty (30) days of receipt. At the request of Purchaser, SCLHS shall provide to Purchaser with documentation for the amounts contained in any invoice. Purchaser shall be responsible for any taxes (including sales and use taxes) imposed by any Governmental Authority with respect to the provision of and payment for the Services pursuant to this Agreement.

**ARTICLE III**
**STEERING COMMITTEE**

3.1    **Transition Managers.**

    (a)    Appointment and Responsibilities.  Purchaser and SCLHS will each appoint a single individual to serve as its primary point of contact for all matters relating to the Services (the "Transition Manager"). Each Transition Manager will serve as a voting member of the Steering Committee (as defined herein). Each Party will name its Transition Manager no later than thirty (30) days after the Effective Date. Each Party may change its Transition Manager at any time and from time to time upon written notice to the other Party. Each Transition Manager may designate a substitute to temporarily perform his or her functions as a Transition Manager upon written notice to the other Party.

    (b)    Additional Responsibilities of Transition Managers.  Each Transition Manager, with respect to the Party he or she represents, will (i) evaluate, negotiate and revise requests by Purchaser for additional or revised Services; (ii) call Steering Committee meetings as appropriate; (iii) serve as a single point of communication for seeking consensus on Services matters both within such Party's organization and between the Parties; and (iv) communicate Steering Committee decisions to the respective Parties and thereafter monitor and facilitate the implementation of such decisions and corresponding action items.

    (c)    Limitations on Power or Authority.  Notwithstanding anything to the contrary in this Agreement, neither Party's Transition Manager will have any power or authority to amend this Agreement or otherwise take any action on behalf of or bind a Party in connection with the Services.

**3.2** **Steering Committee.**

(a)  Purpose and Membership.  The Services will be managed under the authority, direction and guidance of a Services steering and management committee (the "Steering Committee") comprised of up to four members of each Party's organization, including the Transition Managers of each organization, all of whom shall be the voting members of the Steering Committee.  The Steering Committee will be co-chaired by the Transition Managers, each of whom will be responsible for overseeing meetings and have such other responsibilities as the Steering Committee may specify.  Each Party will name its initial members of the Steering Committee no later than thirty (30) days after the Effective Date.  The Steering Committee will conform to the policies and procedures set forth in Section 3.3.

(b)  Responsibility and Authority of the Steering Committee.  Except as otherwise provided in this Agreement, the Steering Committee will have overall responsibility, and the power and authority, to manage, direct, and implement policies and procedures governing the provision of the Services, the scope of any additional or revised Services requested by Purchaser, or the scope of any disengagement services requested by Purchaser.  The Parties acknowledge and agree that SCLHS shall not be obligated to provide additional or revised Services to Purchaser without the written consent of both Parties.  Without limiting the generality of the foregoing, the Steering Committee will have the responsibility, power, and authority to:

(i)  evaluate requests by Purchaser for additional or revised Services;

(ii)  monitor and evaluate the progress of the Services;

(iii)  coordinate the overall relationship between the Parties concerning the Services;

(iv)  oversee any necessary committees relating to the Services; and

(v)  perform such other functions as may from time to time be necessary in furtherance of the Services and consistent with this Agreement.

**3.3** **General Membership and Procedural Matters for the Steering Committee.**

(a)  Membership.  Each Party will appoint as Steering Committee members only those individuals whom it determines possess appropriate technical knowledge and decision-making authority in order to effectively support the responsibilities of the Parties.  Each Party will have the right to remove, replace, provide alternates for and substitute its Steering Committee members at any time and from time to time, with or without cause, immediately upon written notice to the other Party.

(b)   Meetings.

(i)   The Steering Committee will meet at least four times per calendar year or as otherwise mutually agreed to by the Parties. Additional meetings of the Steering Committee may be called by any Transition Manager at any time upon at least fourteen (14) days' prior written notice to the members of the Steering Committee (or such shorter period that members may permit by unanimous agreement).

(ii)   Steering Committee meetings will be held at a location determined by the presiding chairperson at such meeting, although members may elect to attend by audio or video teleconference. The Parties' respective Transition Managers or their respective designees will act as co-chairpersons for each meeting.

(iii)   Non-voting representatives from a Party will be permitted to attend any Steering Committee meeting with the consent of the Transition Managers, which consent will not be unreasonably withheld, conditioned or delayed. Each Party will bear all travel, lodging, meal and other expenses associated with the attendance of its members and other representatives at Steering Committee meetings.

(c)   Decision-Making. Any matter presented to the Steering Committee, and with respect to which it has jurisdiction, will be deemed approved only if at least one (1) voting representative of each Party is present at the meeting and votes in favor of approval of such matter.

(d)   Meeting Agendas and Minutes. At least five (5) days prior to each Steering Committee meeting, the presiding chairperson at such meeting will circulate an agenda setting forth in reasonable detail all business to be considered. The presiding chairperson will also be responsible for designating a person to record and issue minutes of each meeting within fourteen (14) days after the meeting; provided, however, that such minutes will not be finalized until all Parties review and agree upon the accuracy of such minutes in writing.

## ARTICLE IV
## CONFIDENTIALITY

**4.1   Confidential Information.**   For purposes of this Agreement, the term "Confidential Information" shall mean the terms and conditions of this Agreement and any information related to a Party's technology, software programs, methodologies, business rules, processes, requirements, secrets, scientific or technical know-how, and financial, marketing and other business information (including without limitation information concerning its customers and employees).

**4.2   Non-Disclosure of Confidential Information.** Each Party agrees that it shall (a) not disclose or make available the Confidential Information of the other Party to any third party

individual, corporation, partnership or other legal entity, (b) safeguard all Confidential Information received by it using a reasonable degree of care, but not less than that degree of care used by it in safeguarding its own similar information or material, (c) use reasonable efforts to protect from disclosure and keep confidential the Confidential Information of the other Party, including without limitation, protection of documents from theft, loss, destruction, unauthorized duplication and unauthorized discovery of contents, (d) limit access to any Confidential Information received by it to its employees who have a need-to-know in connection with the performance of this Agreement (and each Party further agrees that it shall require any such employee who has access to Confidential Information to agree to be bound by provisions of confidentiality at least as stringent as those provided in this Agreement, and that each Party shall be liable for any breach of the terms of this Agreement by its employees), (e) use all Confidential Information received by it solely for the performance of its obligations under this Agreement and for no other purpose whatsoever, and (f) upon request, return all such Confidential Information of the other Party to such Party at the termination of this Agreement, or certify its destruction and/or removal from any electronic storage media.

4.3   **Exceptions to Non-Disclosure.**   The obligations of confidentiality and restrictions on use as set forth in this Agreement shall not apply to any Confidential Information that the receiving Party proves (a) was in the public domain prior to the date of this Agreement or subsequently came into the public domain by other than an unauthorized disclosure, (b) was previously known to such Party free of any obligation to keep it confidential, or (c) was rightfully received by such Party from a third party whose disclosure would not violate a confidentiality obligation and which disclosure was not in breach of this Agreement.

4.4   **Equitable Remedies.**   The Parties expressly acknowledge that the covenants contained herein are unique and integral to this Agreement and that monetary damages would be an inadequate remedy at law in the event of a breach.  For that reason, the Parties consent that such covenants shall be enforceable in a court of equity by temporary or permanent injunction, restraining order or a decree of specific performance.  The remedies provided above shall be cumulative and not exclusive and are in addition to any other remedies that either Party may have under this Agreement or applicable law.

4.5   **HIPAA Compliance.**   In providing the Services, SCLHS will have access to protected health information of Purchaser and, therefore, shall be considered a business associate of Purchaser for purposes of the privacy regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996.  Consistent with the foregoing, as of the Effective Date the Parties shall enter into a Business Associate Agreement in the form of Exhibit D attached hereto.

## ARTICLE V
## TERM AND TERMINATION

5.1   **Closing.**   For purposes of this Agreement, the "Closing" shall mean the Closing of the Transaction as defined in the Purchase Agreement.

**5.2** **Term and Expiration.** This Agreement shall commence upon the Closing and, unless earlier terminated in accordance with Section 5.3, shall remain in effect until 11:59:59 p.m. Central Time on March 31, 2014 (such period being the "Term" and the termination of this Agreement being the "Termination Date").

**5.3** **Termination Prior to Expiration.** This Agreement may be terminated at any time prior to the Termination Date upon:

(a)     The written agreement of the Parties; or

(b)     The election of the non-defaulting Party in an Event of Default (as defined below); or

(c)     At the election of SCLHS in the event that the existence of or the performance by SCLHS of its obligations under this Agreement is reasonably determined by SCLHS to adversely affect the status of SCLHS or any affiliate of SCLHS as a tax-exempt organization under the Internal Revenue Code; provided, that the Parties shall in good faith determine whether any amendments to this Agreement would cure such issue and in such case the Parties shall cause such amendments to be made (but neither Party shall be obligated to agree to an amendment that materially reduces the benefits to such Party or increases the obligations of such Party under this Agreement).

**5.4** **Termination by Purchaser.** Purchaser may at any time during the Term terminate one or more of the Services specifically identified in Exhibit A in accordance with the provisions set forth in Exhibit C. If provided by SCLHS, Purchaser shall be responsible for (a) any fees related to Disengagement Activities as set forth in Exhibit C and (b) for any costs or fees of SCLHS (or any third parties used by SCLHS) relating to the provision of disengagement services that are not Disengagement Activities under Exhibit C. Otherwise, upon such termination, the fees payable to SCLHS for the Services under this Agreement shall be reduced by the amount specified in Exhibit B for the Service or Services being terminated.

**5.5** **Event of Default.** For purposes of this Agreement, "Event of Default" shall mean any one of the following:

(a)     Any material breach by either Party in the due observance or performance of any covenant, condition, or agreement contained in this Agreement, which breach continues unremedied for thirty (30) days (or five (5) days in the case of the failure to make fee or other payments when due) after written notice of alleged breach is sent by the non-breaching Party to the breaching Party; provided, however, if the breaching Party is using reasonable efforts to remedy a breach (other than the failure to pay any amounts due hereunder) which it is unable to cure within such thirty (30) day period and the breaching Party is able to arrange or provide for an alternative or temporary method of performance reasonably acceptable to the non-breaching Party, then for so long as such reasonable efforts continue, such breach shall, during such extended period, not be an Event of Default. For avoidance of doubt, there shall be no right to cure a failure to pay after five (5) days;

(b)     Either Party: (i) applies for or consents to the appointment of a receiver, trustee, custodian, or liquidator because of its inability to pay its debts as they mature; (ii) makes a general assignment for the benefit of creditors; (iii) becomes adjudicated a bankrupt or insolvent or becomes the subject of an order for relief under Title 11 of the United States Code; (iv) files a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under such law; or (v) suffers the filing against it of an involuntary petition seeking relief under Title 11 of the United States Code, and any such action remains unremedied for ninety (90) consecutive days;

(c)     An order, judgment or decree is entered, without the application, approval, or consent of either Party, by any court of competent jurisdiction, approving a petition seeking reorganization or appointing a receiver of such company or substantially all of the assets of such company, and such order, judgment, or decree continues unstayed and in effect for any period of sixty (60) consecutive days; or

(d)     Either Party is debarred or otherwise excluded from participating in Medicare, Medicaid, or any other governmental health care program.

## ARTICLE VI
## THIRD-PARTY ARRANGEMENTS

The Parties acknowledge and agree that provision of Services is dependent upon the provision by third parties of software, other intellectual property, equipment and other items provided under licenses, leases and other agreements ("Third-Party Arrangements").

6.1     **Continued Performance.** SCLHS hereby agrees at all times during the Term to abide by and punctually and faithfully perform all covenants and requirements of SCLHS under Third-Party Arrangements. To enable SCLHS to fulfill such covenants, Purchaser hereby agrees at all times during the Term to take all actions necessary to ensure such punctual and faithful performance of all covenants and requirements of SCLHS under Third-Party Arrangements and not to take any action or fail to take any action that would cause a default under any Third-Party Arrangement. Further, Purchaser shall take all actions reasonably requested by SCLHS to ensure compliance with Third-Party Arrangements. SCLHS agrees at all times during the Term promptly to notify Purchaser of any notification of any default received by SCLHS under any Third-Party Arrangement to the extent such default affects the Services. Additionally, during the Term, except as may be required as a result of events set forth in Section 5.3, Section 5.5 or Section 6.2, SCLHS agrees not to terminate, amend, modify, or substitute equipment under any Third-Party Arrangements, except as requested by Purchaser.

6.2     **Third-Party Assurances and Prohibitions.** Third parties to Third-Party Arrangements may from time to time require additional agreements and other documentation as a prerequisite to allowing SCLHS to provide Services, and same shall be Third-Party Arrangements upon their effectiveness. SCLHS will not unreasonably refuse to execute such

additional agreements and other documentation; provided that Purchaser shall reimburse SCLHS for any additional charges or costs incurred by SCLHS under the terms of such additional agreements and other documentation; and Purchaser, if Purchaser refuses to execute same or refuses to reimburse SCLHS for such additional charges and costs, acknowledges that related Services may not be provided hereunder as a result; and in any such event SCLHS shall not be liable to Purchaser for any losses or costs in any way related to such cessation or non-provision of such Services. Third parties to Third-Party Arrangements may also seek to prohibit SCLHS from providing Services, alleging that such provision is in breach of Third-Party Arrangements, and in any such event SCLHS may cease provision of related Services, without liability to Purchaser for any losses or costs in any way related to such cessation or non-provision of Services; provided that SCLHS shall use commercially reasonable efforts to obtain all third-party consents necessary for SCLHS to provide Services to Purchaser under this Agreement. Purchaser acknowledges and agrees that it shall be responsible for all charges and costs incurred by SCLHS or Purchaser in connection with obtaining any such third-party consents.

6.3   **Assignment; Replacement.**   To the extent Third-Party Arrangements relate specifically to the Purchased Operations, SCLHS agrees to assign, to the extent possible, all of SCLHS' rights and interests in such Third-Party Arrangements to Purchaser. The Parties agree to use their respective commercially reasonable efforts to cause within one-hundred and fifty (150) days of the Effective Date each Third-Party Arrangement either (a) to be assigned to Purchaser, but only to the extent that such Third-Party Arrangement relate specifically to the Purchased Operation; or (b) if SCLHS and its affiliates require items provided under a Third-Party Arrangement for reasons in addition to the Purchased Operations, to be replaced with separate agreements for such items meeting the respective needs of the Purchased Operations and of SCLHS and its affiliates. Such amended or replaced agreements shall thereupon no longer be deemed Third-Party Arrangements hereunder; Purchaser's liabilities and obligations arising upon and under such assigned or replaced agreements shall be deemed liabilities assumed by Purchaser under the Purchase Agreement; and SCLHS' obligations under replaced agreements shall be deemed liabilities retained by SCLHS under the Purchase Agreement. At the end of such 150-day period, the Parties shall agree to a schedule of remaining Third-Party Arrangements subject to this Agreement. Such remaining Third-Party Arrangements shall remain subject to the terms and conditions of this Agreement. Purchaser shall be solely responsible for all fees and costs associated with assignment or replacement of Third-Party Arrangements pursuant to this Section 6.3. Notwithstanding anything set forth in this Section 6.3, Purchaser acknowledges and agrees that any assignment described in this Section 6.3 shall not include the assignment, transfer or license of any SCLHS IP.

6.4   **Payments.**   Purchaser, at the sole and exclusive option of SCLHS, shall either reimburse SCLHS or pay directly to the applicable vendor all amounts specified as being owed by SCLHS under Third-Party Arrangements that accrue during the Term and are allocable to the Purchased Operations in exchange for SCLHS providing the associated services or allowing Purchaser to use the items provided under Third-Party Arrangements. In the event Purchaser makes payments directly to the applicable vendors, Purchaser shall make such payments in accordance with the applicable Third-Party Arrangement. In the event Purchaser reimburses SCLHS for costs so associated with any Third-Party Arrangement, Purchaser shall make such payment within ten (10) business days of the end of each calendar month during the Term; otherwise, Purchaser shall directly pay the relevant third party. Upon termination of this

Agreement, (a) to the extent SCLHS holds or receives any such amounts, SCLHS promptly shall reimburse Purchaser for any prepaid expenses made by Purchaser either to SCLHS or the applicable vendor under any Third-Party Arrangement for periods extending after termination hereof; and (b) Purchaser promptly shall reimburse SCLHS deposits or prepaid expenses previously made by SCLHS under Third-Party Arrangements to the extent allocable to the Purchased Operations.

     **6.5**    **Insurance.** As of the Effective Date and for the remaining Term, Purchaser shall obtain and maintain general liability insurance with respect to the equipment that is the subject of each Third-Party Arrangement at such limits required by the applicable Third-Party Arrangement, shall name SCLHS as an additional insured with respect to such insurance, and shall provide SCLHS with a copy of the certificate of insurance for such coverage.

     **6.6**    **Indemnification.** Purchaser shall indemnify, defend and hold SCLHS and its affiliates harmless from and against any and all liabilities or obligations to which SCLHS or its affiliates may become subject that arise from or relate to (a) SCLHS' provision of the Services, Purchaser's use of items provided under any Third-Party Arrangement or any default that may occur under any Third-Party Arrangement, except those defaults accruing before the Effective Date or caused by SCLHS' default hereunder or (b) Purchaser's breach (or breach by a third party authorized by Purchaser) of Purchaser's obligations in Section 2.4 of this Agreement.

## ARTICLE VII
## GENERAL PROVISIONS

     **7.1**    **Survival.** Notwithstanding anything contained herein to the contrary, the obligations specified and imposed by Sections 4.1, 4.2, and 4.3 and Article VII shall survive the termination of this Agreement.

     **7.2**    **Entire Agreement/Amendment.** This Agreement and the exhibits hereto and, to the extent applicable, the Purchase Agreement, constitute the entire agreement between and among the Parties relating to the subject matter hereof. This Agreement may not be modified except by a written instrument executed by the Parties hereto. In the event of any conflict between the provisions of this Agreement and the provisions of the Purchase Agreement, the provisions of this Agreement shall prevail.

     **7.3**    **Assignment.** Neither Party may assign its rights or obligations under this Agreement without the prior written consent of the other; provided, however, that either Party may assign its rights and obligations under this Agreement to any of its subsidiaries or affiliates by providing prior written notice to the other Party.

     **7.4**    **Binding on Successors and Assigns.** The terms and provisions contained in this Agreement shall be binding upon and inure to the benefit of the Parties, their successors and permitted assigns.

     **7.5**    **Regulatory Approval and Compliance with Laws.** In the performance of their duties under this Agreement, the Parties shall observe all applicable requirements of laws and regulations, including record retention requirements, and shall maintain in force all licenses and

governmental consents required to perform their obligations hereunder.

7.6    **Arms-Length Bargain.**  The amounts payable to SCLHS hereunder have been established on an arms-length basis, and are fair, commercially reasonable, and do not reflect any consideration for any referrals of business of any nature between or among any of the Parties or their respective affiliates.

7.7    **Notices.**  All notices by either Party to the other shall be delivered in accordance with and to the addresses set forth in the Purchase Agreement.

7.8    **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same instrument.

7.9    **Governing Law.**  The validity, interpretation and performance of this Agreement shall be governed by the laws of the State of Kansas without application of conflict of laws principles.

7.10    **Waiver of Breach.**  Waiver of a breach of any provision of this Agreement shall not be deemed a waiver of any other breach of the same or a different provision.

7.11    **Force Majeure.**  The Parties shall be excused for any failure or delay in performing any of their obligations under this Agreement (other than payment of all amounts due hereunder) if such failure or delay is caused by any reason beyond its control, including without limitation, acts of God or of the public enemy, regulatory or judicial delay or injunction, flood, storm or strikes, war, fire, explosion, insurrection, labor troubles, riots, government requirement, civil or military authority, the elements, earthquakes, acts or omissions of transportation companies, loss of power or technical failure of software or hardware, or other similar causes beyond its control.  In such event, the provisions of this Agreement (or such portions hereof as SCLHS is thereby rendered incapable of performing) shall be suspended for the duration of such interruption.  Should a substantial part of the Services which SCLHS has agreed to provide hereunder be interrupted pursuant to such event for a period in excess of thirty (30) days, either Party shall have the right to terminate this Agreement effective upon thirty (30) days' prior written notice to the other Party.

7.12    **Limitation of Liability.**  EXCEPT AS OTHERWISE PROVIDED HEREIN, IN NO EVENT SHALL EITHER PARTY OR ITS RESPECTIVE AFFILIATES BE LIABLE TO THE OTHER PARTY OR ITS RESPECTIVE AFFILIATES FOR ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF DATA, LOSS OF USE, BUSINESS INTERRUPTION, OR ANY OTHER LOSS), UNDER ANY THEORY OF LIABILITY ARISING FROM THE PERFORMANCE OF, OR RELATING TO, THIS AGREEMENT.  THE MAXIMUM LIABILITY OF SCLHS AND ITS AFFILIATES HEREUNDER SHALL BE LIMITED TO THE FEES PAID TO SCLHS HEREUNDER.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives on the date first above written.

Prime Healthcare Services, Inc.

By: _____
Name: Prem Reddy, M.D., FACC, FCCP
Title:   Chairman, President & CEO

Sisters of Charity of Leavenworth Health System, Inc.

By: _____
Name: Edward L. Barker
Title:   Senior Vice President and Chief Legal Officer

[Signature page to Transition Services Agreement]

Exhibit A
Services


[See attached]

EXHIBIT A

## SCL HEALTH SYSTEM

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Finance | Accounts Payable | • Process AP150, AP155 and AP170 for all 4 Prime Process Levels 516, 517, 518 & 519 on M/W/F.<br>• Receive, open, separate, and FedEx care site invoices received at SCLHS.<br>• Send Prime checks to PMC printer via MHC.<br>• Remove Prime checks from Positive Pay file.<br>• Provide month-end support for non-PO invoices<br>• Assist with proper Lawson access and security for Prime associates. | o See line item detail of services outlined in ATTACHMENT A |
| Finance | Decision Support | • Manage and support MedAssets-Alliance on behalf of the care site which is required for contract modeling and costing of detailed charges.<br>• Load data out of Epic on a daily basis into Alliance.<br>• Add, Changes, Deletions to Charge Master<br>• Research and implement coding changes and price increases<br>• Evaluation of charges to include: CCI edits, zero dollar WQ, account WQ to evaluate possible missing charges, work with HIM coders re: coding/charging issues, missing modifiers, missing devices, etc.<br>• Evaluation of WQs to evaluate missing charges (i.e., room & board, missing status orders, etc.), charge router errors, interface issues, review of documentation and charge entry for infusion services.<br>• System and database administration, loading and verifying data, monthly balancing. | |
| Finance | Fixed Assets | • Maintain Lawson-Asset Management module.<br>• Perform month end close routines related to fixed assets. | o No monthly charge for Business Continuation services |

EXHIBIT A

**SCL HEALTH SYSTEM**

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Finance | Accounting Support | • Manage Lawson-General Ledger on behalf of the care site.<br>• Provide day-to-day support to add and maintain accounting units required for care site.<br>• Run nightly batch jobs to interface and post other modules (AP, PR, AM) into the General Ledger.<br>• Manage and maintain interfaces with Epic, resolve errors as required.<br>• Provide security-class builds and maintenance.<br>• Manage new users set up and changes.<br>• Direct month end close activities required for new PMC. Process Levels, includes manual journal entries. | ○ See line item detail of services related to Lawson support outlined in ATTACHMENT B |
| Finance | Payroll | • Process and post LP140 and LP197 manual PTO/ESL adjustments<br>• Process FLSA overtime calculation PR132<br>• Process and balance PR140 payroll and deduction calculation<br>• Process and post LP140 and LP197 PTO/ESL usage and accrual<br>• Create check and ACH files PR160<br>• Import check files into MHC and create images<br>• Create payroll register PR141<br>• Close payroll PR197 and balance<br>• Post payroll to the GL PR198 and balance<br>• Transfer PTO/ESL accrual balances from Lawson to Kronos<br><br>Monthly only:<br>• create end of month PTO accruals LP198 | ○ See line item detail of services related to Payroll support outlined in ATTACHMENT C |

2

EXHIBIT A

SCL HEALTH SYSTEM

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| | HIM Coding | • Conduct all activities associated with EPIC acute-care coding, including ICD10 transition for the care site. (BAU)<br>• Train associates for coding in Epic, CDIS and computer assisted coding applications.<br>• Activities are performed as needed and will be discontinued when coding and CDIS services are terminated. | o All activities are performed by SCLHS coders<br>o Will transition as Prime coders ASAP. |
| | HIM Operations | • Maintain off-site storage through a third party. Function transferred to Prime when has new vendor/contract is in place.<br>• Provide oversight and day-to-day operations for master patient index (MPI), merging duplicate medical records, overlay corrections, error corrections in medical record. (BAU). Function to continue until Prime transitions to its own electronic record system.<br>• Provide oversight of patient registration and clinical medical record forms (BAU). Function to continue until Prime transitions to its own electronic record system.<br>• Manage document imaging applications, including conversions, build, upgrades, etc. (BAU). Function is required until Prime replaces systems or processes. | o All activities are performed by SCLHS |
| | HIM Transcription | • Provide dictation and transcription services using eScription (BAU). Function to continue until Prime is on its own "service area" of Epic. | o All activities are performed by SCLHS<br>o To be transitioned as soon as possible. |

3

EXHIBIT A

SCL HEALTH SYSTEM

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Human Resources | Human Resources IS | • Manage Lawson - Human Resources Module.<br>• Support day-to-day and mission critical processes in Lawson that govern care site employee's information.<br>• Support Employee Self Service functionality.<br>• Track and manage transaction employee events (BAU). | |
| Revenue Services Center | RSC Administration | • Perform end-to-end billing activities for patients from patient access through collections.<br>• Manage insurance billing and cash payments.<br>• Coordinate Medicare, RAC and ADR notices.<br>• Manage all self-pay collections and Customer Service function. SCLHS will act as the billing agent for PMC/Prime (BAU). | |
| Revenue Services Center | RSC Cash Mgmt | • n/a – See above | |
| Revenue Services Center | RSC Compliance | • n/a – See above | |
| Revenue Services Center | RSC Pre Access | • n/a – See above | |
| Revenue Services Center | RSC-Self Pay Mgmt | • n/a – See above | |

4

EXHIBIT A

SCL HEALTH SYSTEM

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description<br>Business As Usual<br>"BAU"<br>(Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Risk Management | Safety Reporting | • Support care site safety program with the use of a Safety Event reporting tool (Quantros)<br>• Produce periodic reporting of incidents. | o Added 3/28 |
| Supply Chain | Supply Chain Management | • Manage Lawson SCM module which is required for requisitions, purchase orders, materials management, etc. This includes testing, training, and issue resolution as well.<br>• This cannot be separated until Prime has own instance of Lawson/Epic | |
| Supply Chain | Third Party SCM | • Provide item maintenance, catalog maintenance, and all buyer functions (excluding capital purchases).<br>• Buyer function could be separated with MedAsset approval<br>• Item and Catalog maintenance cannot be separated out<br>• Maintain strategic sourcing relationship which can be leveraged by Prime, as appropriate. | |
| Supply Chain | Purchasing | • Processing purchase requisitions and POs<br>• Manage sourcing for supplies and manage vendors relationships<br>• Manage procurement strategies | o Will transition ASAP |
| General | TSA Point of Contact | • See "Transition Manager" as defined by the Transition Service Agreement, Section 3.1 | |

EXHIBIT A

SCL HEALTH SYSTEM

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Site IT Operations | Site Application and Technology Support | • Provide STSC oversight and support as needed of on-site, end-user and site-specific stand-alone application support. <br> • Provide STSC oversight and support as needed of site-specific maintenance and procurement for local resources. <br> • Provide STSC oversight and support as needed of imaging for PCs and support of peripheral devices and mobile devices. | o Day-to Day onsite activity will be performed by local resources (formerly SCLHS – STSC). <br> o Since many applications are hosted by SCLHS, STSC may need to provide oversight and support. <br> o Fees will be billed on time & materials basis. |
| Site IT Operations | Site Infrastructure Support | • Support site-specific infrastructure management including system availability, problem troubleshooting and resolution, escalation with vendors, patch management and implementation and batch run scheduling and recovery. Infrastructure includes data network, client applications, servers, storage, databases and system administration. | o Day-to Day onsite activity will be performed by local resources (formerly SCLHS – STSC). <br> o Since many applications are hosted by SCLHS, STSC may need to provide oversight and support. <br> o Fees will be billed on time & materials basis. |
| Business Systems | ERP Maintenance and Support | • Provide services to implement maintain and support business systems. <br> • Implement system enhancements and routine patching as required. | |
| Business Systems | ERP Super User Support | • Provide Tier 2 technical and functional support to business users. | |

6

EXHIBIT A

SCL HEALTH SYSTEM

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Clinical Applications | eSummit Business | • Provide ongoing development and maintenance of EPIC applications for CBO, revenue management and finance (including financial extracts for downstream systems and third party vendors). <br> • Provide support and development of EPIC modules for patient scheduling, all admit, discharge and transfer functions for acute care in- and out-patient services. <br> • Provide development and support of Health Information Management EPIC applications as well as 3M, eScription and Optio to support patient's legal medical record. <br> • Provide development and support of clinical and business report writing. <br> • Provide environment management and security in support of development and testing. | |
| Clinical Applications | eSummit EMR-Acute | • Support Clinical Innovations for acute care hospitals; development and application support for acute care Epic modules. | |
| Non-EPIC Clinical Ancillaries | Application Hosting Services | • Provide hosting for non-EPIC systems including PICIS, PulseCheck and GE-Centricity Radiology Information System. | |
| Non-EPIC Clinical Ancillaries | Environment Hosting Services | • Provide management of test and production build requests, resolution of issues and escalation to vendors to resolve database or interface errors. | |
| Non-EPIC Clinical Ancillaries | Lab Information System | • Provide development and support of Sunquest Enterprise Lab Information System. | |

EXHIBIT A

**SCL HEALTH SYSTEM**

Providence Health
**TRANSITION SERVICES AGREEMENT**
**Description of Services**

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Infrastructure | Infrastructure Management | • Provide technology infrastructure required for hosted systems and applications (data network, client applications, servers, storage and databases) including system availability, problem troubleshooting / resolution, vendor escalation, back-up and batch run scheduling and recovery, patch management. | |
| Infrastructure | Network | • Provide network support for system availability, problem troubleshooting / resolution and vendor escalation for dedicated data circuits, consolidated data circuits, wide area network (WAN) and Ethernet. . | ○ While STSC is providing "Infrastructure Management", STSC may need to respond is issues or partner with vendors ○ No monthly Business Continuation charge ○ Fees will be billed on time & materials basis. |
| Infrastructure | Telecom | • Support hosted voice applications including conferencing, faxing, etc. | |
| Infrastructure | Disaster Recovery | • Provide full-service disaster recovery on hosted systems including EPIC, GE-Imagecast, Lawson, Kronos, PICIS, FUJI and Extelligence. | |
| Infrastructure | Application Interfaces | • Provide development, maintenance and 24x7x365 support of engine-based application interfaces, file moves and point-to-point interfaces between EMR and other systems. | |
| Infrastructure | Infrastructure - Data Center | • Provide physical site support (rent, utilities, physical site maintenance) for Data Center facilities in Lakewood, CO and Lenexa, KS. | |
| Security | Security Monitoring | • Provide security monitoring and investigation of malicious activity on network and systems. | |

EXHIBIT A

**SCL HEALTH SYSTEM**

**Providence Health**
**TRANSITION SERVICES AGREEMENT**
**Description of Services**

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Security | Security Auditing | • Conduct security process audits, incident response and security awareness communication.<br>• Provide response to HRIS and compliance security investigations.<br>• Provide maintenance of internet controls and security. | |
| Security | Controls and Procedures | • Provide maintenance of security controls and procedures. Implement changes in response to audit findings. | o While STSC is providing "Security Monitoring", STSC may need to implement changes.<br>o No monthly Business Continuation charge<br>o Fees will be billed on time & materials basis. |
| Security | Advisory Services | • Provide advisory services on HIPPA security, payment card industry standards and PII around identity theft. | |
| Security | Incident Response | • Provide response to Security Operations Command (SOC) incidents. | |
| Customer Support | Service Delivery | • Provide oversight of care site print management, IT-specific application tools, application administration, innovation, IT research and development, incident command, computer image management and hardware standards. | |
| Customer Support | Identity Management | • Provide identity management in the creation, modification and deletion of end-user login usernames and passwords, password resets and application access provisioning. | |

9

EXHIBIT A

SCL HEALTH SYSTEM

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

| Functional Area | Department Name | Department Description Business As Usual "BAU" (Edit for PMC/SJL as needed) | Comments & Changes |
|---|---|---|---|
| Customer Support | Training | • Provide training - including the development of training curriculum, materials and delivery methods - to support clinical and business systems including eSummit (EPIC), Lawson, Kronos and HR systems including, Payroll, Finance - Account Analytics, Supply Chain Contract Management and Microsoft Operating System and Office Suite training. | |
| Customer Support | IT Service Management | • Provide change management of production system changes to assure proper deployment protocols and risk mitigation and technical support of the ITSM tool. | |
| Customer Support | IT Help Desk | • Provide 24x7 IT Help Desk support for all IT systems including afterhours paging support for critical issues; licensing and usage of site application and end user support to access and use help desk tool for managing site related support issues. | |
| Customer Support | Web Development | • Provide design, development, implementation and maintenance of web portal, intranet and internet. | |
| Customer Support | Project Management – Transition & Disengagement | • Develop project plans, leverage project management tools, and direct the execution of Transition Support Services and/or Disengagement activities. | o Required to support large initiatives like migration from/to new EMR and ERP systems. o Fees will be billed on time & materials basis. |
| Other | Depreciation | • Reflects depreciation costs for system service capital investment and infrastructure. | |

10

**Exhibit B**
**Service Charges**

[See attached]

EXHIBIT B

SCL Health System
Providence Health

TRANSITION SERVICES AGREEMENT
Summary of System Services Support Costs [1]

| Description | Business Continuation Service Costs (Monthly) | Transition Support Services Cost [2] | Short-Term "Carry Over" Service Costs [3] | Total Costs |
|---|---|---|---|---|
| **Finance Support Services** | | | | |
| Accounting Support | $ 45,303 | $ | 0 | $ 0 | $ 45,303 |
| Accounts Payable | 21,778 | | 0 | 0 | 21,778 |
| Decision Support | 20,298 | | 0 | 0 | 20,298 |
| Payroll | 1,920 | | 0 | 0 | 1,920 |
| Subtotal | $ 89,299 | $ | 0 | $ 0 | $ 89,299 |
| Health Information Management | $ 87,589 | $ | 0 | $ 0 | $ 87,589 |
| Human Resources Information Systems | $ 5,246 | $ | 0 | $ 0 | $ 5,246 |
| Revenue Services Center | $ 174,221 | $ | 0 | $ 0 | $ 174,221 |
| Risk Management | $ 285 | $ | 0 | $ 0 | $ 285 |
| Supply Chain Management | $ 26,288 | $ | 0 | $ 0 | $ 26,288 |
| TSA - Point of Contact | $ 13,611 | $ | 0 | $ 0 | $ 13,611 |
| **System & Technology Services Center** | | | | |
| Site IT Operations | $ 0 | $ | 0 | $ 0 | $ 0 |
| Business Systems ERP | 21,939 | | 0 | | 21,939 |
| Clinical Applications | 155,063 | | 0 | | 155,063 |
| Non-EPIC Clinical Ancillaries | 44,123 | | 0 | | 44,123 |
| IT Infrastructure | 116,416 | | 0 | | 116,416 |
| Security | 10,487 | | 0 | | 10,487 |
| Additional STSC Support Services | 43,350 | | 0 | | 43,350 |
| Subtotal STSC | 391,378 | | 0 | | 391,378 |
| Asset Depreciation | 158,211 | | 0 | | 158,211 |
| Subtotal STSC with Depreciation | $ 549,589 | $ | 0 | $ 0 | $ 549,589 |
| **Total** | $ 946,128 | $ | 0 | $ 0 | $ 946,128 |

[1] Service cost descriptions are provided in ATTACHMENT D.
[2] The full scope of Transition Support Services has not been defined.  When identified these costs will be billed to Prime on a time and materials basis, at a fixed composite rate plus 4%
[3] The full scope of Short-term "Carry Over" costs have not been defined .  When identified these costs will be billed to Prime on a time and materials basis, at a fixed composite rate plus 4%.

EXHIBIT B
Page 1 of 3

SCL HEALTH SYSTEM
Providence Health

TRANSITION SERVICES AGREEMENT
Description of Prices by Service Category

| Type | Functional Area | Department Name | Business Continuation (Monthly) | Transition Support Services (Fixed fee or Hourly) [1] | Short-Term "Carry Over" Services (Fixed fee or Hourly) [1] | Summary of Change |
|---|---|---|---|---|---|---|
| Non-IT | Finance | Accounts Payable | $21,778 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Finance | Decision Support | $20,298 | Standard Hourly Rate | Standard Hourly Rate | Increase of $3,028 due to based on updated information from Decision Support team |
| Non-IT | Finance | Fixed Assets | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Finance | Accounting Support | $45,303 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Finance | Payroll | $1,920 | Standard Hourly Rate | Standard Hourly Rate | Not estimated in 3/21 draft |
| Non-IT | HIM | HIM Coding | $57,711 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | HIM | HIM Operations | $7,502 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | HIM | HIM Transcription | $22,376 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Human Resources | Human Resources IS | $5,246 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Revenue Services Center | RSC Administration | $174,221 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Revenue Services Center | RSC Cash Mgmt | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Revenue Services Center | RSC Compliance | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Revenue Services Center | RSC Pre Access | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Revenue Services Center | RSC-Self Pay Mgmt | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Risk Management | | $285 | Standard Hourly Rate | Standard Hourly Rate | Not estimated in 3/26 draft |
| Non-IT | Supply Chain | Supply Chain Management | $13,589 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | Supply Chain | Third Party SCM | $2,540 | Standard Hourly Rate | Standard Hourly Rate | |

SCL HEALTH SYSTEM
Providence Health

TRANSITION SERVICES AGREEMENT
Description of Prices by Service Category

| Type | Functional Area | Department Name | Business Continuation (Monthly) | Transition Support Services (Fixed fee or Hourly) | Short-Term "Carry Over" Services (Fixed fee or Hourly) | Summary of Change |
|---|---|---|---|---|---|---|
| Non-IT | Supply Chain | Purchasing | $10,159 | Standard Hourly Rate | Standard Hourly Rate | |
| Non-IT | General | TSA Point of Contact | $13,611 | Standard Hourly Rate | Standard Hourly Rate | See "Transition Manager" as defined by the Transition Service Agreement, Section 3.1 |
| IT | Site IT Operations | Site Application and Technology Support | $0 | Standard Hourly Rate | Standard Hourly Rate | Reduction of $229K monthly because Prime will hire local IT Site Support. SCLHS will be available to support issues or escalations as needed. |
| IT | Site IT Operations | Site Infrastructure Support | $0 | Standard Hourly Rate | Standard Hourly Rate | Reduction of $2.4K monthly because Prime will hire local IT Site Support. SCLHS will be available to support issues or escalations as needed. |
| IT | Business Systems | ERP Maintenance and Support | $21,939 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Business Systems | ERP Super User Support | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Clinical Applications | eSummit Business | $105,862 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Clinical Applications | eSummit EMR-Acute | $49,199 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Non-EPIC Clinical Ancillaries | Application Hosting Services | $16,838 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Non-EPIC Clinical Ancillaries | Environment Hosting Services | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Non-EPIC Clinical Ancillaries | Lab Information System | $27,285 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Infrastructure | Infrastructure Management | $80,960 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Infrastructure | Network | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Infrastructure | Telecom | $8,983 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Infrastructure | Disaster Recovery | $0 | Standard Hourly Rate | Standard Hourly Rate | |

SCL HEALTH SYSTEM
Providence Health

TRANSITION SERVICES AGREEMENT
Description of Prices by Service Category

| Type | Functional Area | Department Name | Business Continuation (Monthly) | Transition Support Services (Fixed fee or Hourly)[1] | Short-Term "Carry Over" Services (Fixed fee or Hourly)[1] | Summary of Change |
|---|---|---|---|---|---|---|
| IT | Infrastructure | Application Interfaces | $10,599 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Infrastructure | Infrastructure – Data Center | $15,874 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Security | Security Monitoring | $10,487 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Security | Security Auditing | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Security | Controls and Procedures | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Security | Advisory Services | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Security | Incident Response | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Customer Support | Service Delivery | $14,647 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Customer Support | Identity Management | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Customer Support | Training | $3,876 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Customer Support | IT Service Management | $22,237 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Customer Support | IT Help Desk | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Customer Support | Web Development | $2,590 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Customer Support | Project Management – Transition & Disengagement | $0 | Standard Hourly Rate | Standard Hourly Rate | |
| IT | Other | Depreciation | $158,211 | Standard Hourly Rate | Standard Hourly Rate | |

[1] The standard hourly for SCL Health System Associates under this agreement is $120 per hour plus 4%.

**Exhibit C**
**Disengagement**

This Exhibit C (this "Exhibit") sets forth the responsibilities and obligations of the Parties in connection with the Parties' orderly separation of information systems activities functions prior to the expiration of the Term or following termination of this Agreement, all as mutually agreed to by SCLHS and Purchaser ("Disengagement"). Purchaser acknowledges and agrees that SCLHS shall not be required to provide disengagement services pursuant to the Agreement, including this Exhibit C, beyond the Term.

1.   General Principles. SCLHS and Purchaser adopt and agree to pursue the process of Disengagement in accordance with the following general principles:

1.1.   SCLHS will require, and Purchaser will grant, continuing access to the Purchased Operations in order to provide safe patient care during Disengagement.

1.1.1.   The Parties acknowledge that the scope and content of any Disengagement Activities (as defined below) will be dependent on the information system model that Purchaser desires to implement. Since that model is not yet identified, the Parties acknowledge that it is difficult to articulate a detailed Disengagement Plan (as defined below) in advance.

1.1.2.   The Parties acknowledge that while some aspects of the Disengagement can only be identified and agreed to during Disengagement planning, other aspects of the Disengagement are predictable and so fundamental to the process that the parties desire prior to Disengagement planning to document their commitment to deliver certain items and perform certain tasks. The specific items and tasks identified in this Exhibit are not intended to encompass all items and tasks required for Disengagement but only those anticipated fundamental requirements.

1.1.3.   Purchaser and SCLHS understand and agree that in order for Purchaser to continue to employ functionality in the Purchased Operations similar to that provided as part of the Services, after termination of such Services under the Agreement, Purchaser may need to secure licenses from Epic and other third-party vendors.

1.2.   All tasks in execution of Disengagement performed by the parties pursuant to this Exhibit C or the Disengagement Plan shall be referred to as "Disengagement Activities."

1.3.   SCLHS and Purchaser acknowledge and agree that in order for the Purchased Operations to be able to continue to provide patient care and conduct business operations, transfer of allowable and agreed upon SCLHS functionality to Purchaser or to a third-party service provider, and transition to replacement hospital information systems (a) Purchaser and SCLHS must pursue Disengagement planning in good faith; and (b) SCLHS will continue to provide affected Services during the Disengagement Period (as defined below). Purchaser and SCLHS will begin the Disengagement Activities in accordance with the time frames specified herein and in the applicable Disengagement Plan.

1.4.   The Disengagement Period shall end no later than the end of the Term or such other date as mutually agreed by the parties in any applicable Disengagement Plan (the "Disengagement Period") or in a mutually agreed amendment to any applicable Disengagement Plan.

1.5.   No Disengagement Activity will be considered complete until (a) the Party responsible for each deliverable certifies in writing that the deliverable contains all of the elements required by the Disengagement Plan; and (b) the Party to whom a deliverable is provided acknowledges receipt of the deliverable and confirms that it is functional and complete. Once all Disengagement Activities have been completed, including without limitation

completion of the certification process set forth in Section 6.2 of this Exhibit, Purchaser will provide to SCLHS a written notice stating that Disengagement is finished (the "Final Disengagement Notice").

2.   Disengagement Planning.

2.1.   Purchaser and SCLHS will commence Disengagement planning not later than fifteen (15) days after the "Notice Date," which shall mean a date that is the earlier of (a) if the termination is on notice only, the date that a notice of termination of the Agreement or affected Service (in whole or in part) delivered in accordance with Section 5 of the Agreement; or (b) if the termination is effective after the expiration of a cure period under the Agreement, that date after which a Party has failed to cure, or that the cure period has expired.  Each service or application provided by SCLHS under this Agreement may have a different Notice Date for Disengagement of such service or application.

2.2.   Not later than fifteen (15) days after the Notice Date, the members of the Steering Committee as provided in the Agreement will meet in person to appoint a disengagement team (the "Disengagement Team"). The Disengagement Team will consist of members of the Steering Committee, consultants, and such representatives of the Parties possessing the appropriate technical skills and decision-making authority within their respective organizations as may be necessary to ensure completion of the Disengagement Activities in a timely and professional manner.

2.3.   Not later than thirty (30) days after the Notice Date, the Disengagement Team will meet in person to identify in writing the principal elements of the Disengagement Plan (defined below) to include: a preliminary list of Disengagement Activities to be performed by each Party in addition to those specified in this Exhibit C, a list of basic milestones to be achieved in Disengagement and a projected timeline for achievement of those milestones, and the projected duration of Disengagement.

2.4.   Not later than forty-five (45) days after the Notice Date:

2.4.1.   The Disengagement Team will meet in person to identify in writing the detailed list of Disengagement Activities to be performed by each Party in addition to those specified in this Exhibit C, the timeline for performance of the Disengagement Activities, and the duration of Disengagement ("Disengagement Plan");

2.4.2.   Firm pricing and a payment schedule will have been agreed upon for provision by SCLHS of services to Purchaser under the Disengagement Plan, where failure of Purchaser to pay the requisite amounts fifteen (15) days after invoice shall give SCLHS the right to terminate its performance under the Disengagement Plan upon notice to Purchaser; and

2.4.3.   The Parties shall sign the Disengagement Plan as a binding agreement of the Parties.

2.5.   With respect to Sections 2.3 and 2.4 of this Exhibit, the Parties acknowledge and agree that the timeframes set forth in the Disengagement Plan will be established in such a way as to appropriately support Purchaser's ability to convert to a replacement system while still maintaining the integrity of information systems in service for the Purchased Operations.

2.6.   For the remainder of the Disengagement Period, the Disengagement Team will meet not less than monthly to identify any additional Disengagement Activities, review and supplement the Disengagement Plan, and ensure that the Parties' Disengagement Activities obligations are being discharged in a timely and professional manner.

2.7.   Disengagement Team members will attend all assigned Disengagement meetings.

3.   Obligations of the Parties.

   3.1.   Mutual Obligations.

      3.1.1.   Purchaser and SCLHS shall perform the Disengagement Activities in order to support each Party's ability to continue to provide patient care and conduct business operations during Disengagement.

      3.1.2.   Purchaser and SCLHS understand and agree that the rights of Epic and other third-party vendors limit SCLHS' ability to directly transfer certain software and other information to Purchaser.   Any software or other information may include mutually agreed to data transfers, but in no event shall such transfers include delivery or assignment of, or license to, SCLHS IP or other content, or other third-party content or intellectual property. In the event that Purchaser determines that it wishes to continue to use third-party software applications upon termination or expiration of the Agreement, Purchaser will need to secure a license and other services from the applicable third party. Accordingly, any obligation by SCLHS to supply functionality pursuant to this Section 3 is expressly conditioned upon Purchaser's securing such necessary licenses.

   3.2.   SCLHS Obligations.

      3.2.1.   In accordance with the time frames set forth herein, SCLHS shall perform the following Disengagement Activities:

      (a)   Not later than ten (10) days following a written request from Purchaser, provide Purchaser with all clinical content identified by Purchaser that SCLHS has not already provided to Purchaser.

      (b)   Not later than thirty (30) days following a written request from Purchaser or such other time as mutually agreed by the Parties in the Disengagement Plan, provide Purchaser with all purchaser patient data and purchaser business data identified by Purchaser (including archived data) that is maintained by SCLHS pursuant to the Agreement and that SCLHS has not already provided to Purchaser. The Parties expressly agree to work collaboratively to ensure that all such data is received by Purchaser in a usable format;

      (c)   Not later than sixty (60) days after SCLHS' receipt of the final Disengagement Notice or such other time as mutually agreed by the parties in the Disengagement Plan, remove any remaining Purchaser business data and Purchaser patient data (except for Purchaser patient data that is also SCLHS patient data), except to the extent that SCLHS determines that it is legally obligated to retain any such data;

      (d)   After SCLHS' receipt of the final Disengagement Notice, return to Purchaser any further confidential information of Purchaser in its possession or, upon request by Purchaser, destroy or erase such confidential information and all copies thereof and certify in writing that it has been destroyed;

      (e)   Throughout the Disengagement Period, subject to SCLHS' security requirements and the terms and conditions of the Agreement, provide necessary access to SCLHS facilities, infrastructure and software so as to enable Purchaser to perform its Disengagement Activities; and

      (f)   Provide such other items and complete such other tasks as may be specified in the Disengagement Plan.

3.2.2.   Following SCLHS' receipt of the final Disengagement Notice, SCLHS shall no longer have any obligation to retain, archive or otherwise store any Purchaser information, data or materials, except as required by law.

3.3.   Purchaser Obligations.

3.3.1.   Except as otherwise mutually agreed in writing or expressly provided in this Exhibit C, Purchaser shall cease all use of software and applications unless Purchaser has a separate license for such software and application, including associated hardware, at the end of the Disengagement Period or such later time (a) as may be mutually agreed to by the Parties in the Disengagement Plan; or (b) as is necessitated pursuant to Section 1.4 of this Exhibit C.

3.3.2.   In accordance with the time frames set forth herein, Purchaser shall:

(a)   Not later than forty-five (45) days following a written request from SCLHS or such other time as mutually agreed by the parties in the Disengagement Plan, deliver to SCLHS all SCLHS and third-party logical and physical security tools;

(b)   Not later than fifteen (15) days after Purchaser's receipt of the final Disengagement Notice or such other time as mutually agreed by the parties in the Disengagement Plan, remove any SCLHS business data and SCLHS patient data (except for SCLHS patient data that is also Purchaser patient data) that resides in any Purchaser systems, databases or archives;

(c)   After Purchaser's receipt of the final Disengagement Notice, return to SCLHS any further confidential information of SCLHS in Purchaser's possession or, upon request by SCLHS, destroy or erase the foregoing materials and all copies thereof and certify in writing that they have been destroyed;

(d)   Throughout the Disengagement Period, subject to Purchaser's security requirements and the terms and conditions of the Agreement, provide necessary access to Purchaser facilities, infrastructure and software so as to enable SCLHS to perform the Disengagement Activities; and

(e)   Provide such other items and complete such other tasks as may be specified in the Disengagement Plan.

3.3.3.   Following SCLHS' receipt of the final Disengagement Notice, Purchaser shall no longer have any obligation to retain, archive or otherwise store any SCLHS information, data or materials except as required by law.

4.   Charges. In the event that Purchaser terminates a Disengagement Plan without cause, then all costs incurred by SCLHS relating to its performance of Disengagement Activities shall be charged to and reimbursed by Purchaser within fifteen (15) days of SCLHS' invoice therefor.

5.   Patient Data. Purchaser shall return the SCLHS patient data to the appropriate SCLHS custodian or steward, and SCLHS shall return the Purchaser patient data to the appropriate Purchaser custodian or steward.

6.   Conclusion of Disengagement.

6.1.   Upon completion of the Disengagement Activities, each Party shall deliver to the other Party any remaining reports and documentation owned by the other Party that are still in a Party's possession.

6.2.   Upon conclusion of Disengagement: (a) each Party shall perform a closing audit at its own expense to certify that it has discharged all information and performed all tasks

KCP-4308917-3

appropriately; and (b) the Parties will mutually sign-off and certify that there are no continuing Disengagement obligations.

7.    Agreement in Effect. The Parties' performance of Disengagement Activities relating to Disengagement shall be subject to the terms and conditions of the Agreement in existence as of the Notice Date and the Agreement shall survive in its entirety throughout the duration of the Disengagement Period. The Parties acknowledge that Disengagement Activities could impact the Parties' respective discharge of their obligations and that the Parties may mutually agree to identify certain impacts in the Disengagement Plan.

**Exhibit D**
**Business Associate Addendum**

This Business Associate Addendum (this "BAA") is entered into as of the Effective Date by and between SCLHS and Purchaser, as such parties are defined in the Transition Services Agreement to which this BAA is a part (the "Agreement"). Stylized terms used, but not defined, in this BAA shall have the meanings given them in the Agreement.

1. Definitions.

   1.1. "Breach" has the same meaning as the term "Breach" in 45 CFR 164.402.

   1.2. "Breach Notification Rule" means Breach Notification for Unsecured Protected Health Information at 45 CFR part 164, subpart D.

   1.3. "Business Associate" means SCLHS.

   1.4. "Covered Entity" means Purchaser.

   1.5. A "Designated Record Set" means those records maintained by or for Covered Entity, including the medical records about Individuals maintained by Business Associate through provision of Services.

   1.6. "Electronic Protected Health Information" has the same meaning as set forth in 45 CFR 160.103.

   1.7. "HIPAA" means the Health Insurance Portability and Accountability Act, as amended, by the Health Information Technology for Economic and Clinical Health Act of 2009, and the regulations promulgated thereunder, including the Privacy Rule, the Security Rule and the Breach Notification Rule.

   1.8. "Individual" has the same meaning as the term "individual" in 45 CFR 164.501 and shall include a patient as well as a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g) (e.g., a guardian, parent of a minor, health care agent).

   1.9. "Privacy Rule" means the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.

   1.10. "Protected Health Information" or "PHI" means that subset of health information, including demographic information, collected from an Individual that is created or received by a health care provider, health plan, employer or health care clearinghouse and relates to the physical or mental health of an Individual or the provision of health care services to that Individual. The information either identifies the Individual or there is a reasonable basis upon which to believe that the information could be used to identify the Individual. PHI shall have the same meaning as the term "protected health information" in 45 CFR 164.501, limited to the information created, maintained, or received by Business Associate from or on behalf of Covered Entity.

1.11. "Required by Law" has the same meaning as the term, "required by law" in 45 CFR 164.501.

1.12. "Security Incident" has the same meaning as set forth in 45 CFR 164.304.

1.13. "Security Standards" means the Security Standards for the security of electronic health information at 45 CFR Parts 160, 162 and 164.

1.14. "Unsecured Protected Health Information" has the same meaning as the term "Unsecured Protected Health Information" in 45 CFR 164.402.

1.15. "Workforce" has the same meaning as set forth in 45 CFR 160.102.

1.16. Other Capitalized Terms and Phrases – Any other capitalized terms and phrases that are used in this Agreement and defined in HIPAA shall have the meanings as set forth in HIPAA, which definitions are incorporated in this Agreement by this reference.

2. Business Associate's Obligations and Activities.

2.1. Permitted Uses and Disclosures of PHI.

2.1.1. General Terms of Use and Disclosure of PHI. Except as otherwise provided in this BAA or in the Agreement, Business Associate may use or disclose PHI only to perform functions, activities or services for, or on behalf of, Covered Entity; provided that such use or disclosure would not violate the Privacy Rule if done by Covered Entity, or as may be required by law.

(a) Disclosure to Workforce. Business Associate agrees not to disclose PHI to any member of its Workforce unless and until Business Associate has advised such person of its obligations under this BAA and of the consequences to the Individual and the Business Associate of violating them. Business Associate agrees to take appropriate disciplinary action against any member of its Workforce who uses or discloses PHI in a manner inconsistent with this BAA.

(b) Minimum Necessary Obligations. Business Associate agrees to make Uses and Disclosures of Protected Health Information consistent with minimum necessary requirements under HIPAA, including, but not limited to:

(i) identification of persons or classes of persons needing access to Protected Health Information to carry out duties and the associated categories of information to which each person or class of persons is permitted to access;

(ii) implementation of reasonable efforts to limit access of such persons or classes to Protected Health Information to the categories of information identified as necessary;

(iii) implementation of policies and procedures or criteria designed to limit Protected Health Information disclosed to the information

reasonably necessary to accomplish the purpose for which disclosure is sought; and

(iv)   limitation of any requests for information to the amount of information necessary to accomplish the purpose for which the request is made.

2.1.2. Specific Uses and Disclosures of PHI. Pursuant to the terms of this BAA, Covered Entity shall permit Business Associate to use or disclose PHI for the purpose of performing its obligations under the Agreement.

2.1.3. Additional Permitted Uses and Disclosures. In addition to those uses and disclosures permitted in order to provide the services referenced in Section 2.1.2, and except as otherwise provided in this BAA, the Business Associate may also use or disclose PHI it obtains from, maintains or creates on behalf of Covered Entity as follows.

(a)   Use or Disclosure of PHI for Internal Management Purposes. Business Associate may use or disclose PHI for the proper management and administration of the Business Associate or to carry out its legal responsibilities; provided that disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(b)   Data Aggregation Services. Business Associate is also permitted to use or disclose PHI to provide data aggregation services as that term is defined by 45 CFR 164.501, relating to its health care operations.

2.1.4   Additional Requirements.

(a)   Required Implementation of Safeguards. Business Associate will use appropriate administrative, technical, and physical safeguards with respect to Protected Health Information, and comply with Subpart C of 45 C.F.R. Part 164 with respect to Electronic Protected Health Information, to prevent Use or Disclosure of Electronic Protected Health Information other than as provided for by the Agreement. Covered Entity shall have the right to request a list of the safeguards that Business Associate has implemented to protect its Protected Health Information and its Electronic Protected Health Information and shall further have the right to audit or monitor Business Associate's compliance with this requirement.

(b)   Assurances from Subcontractors/Agents. Business Associate will only permit subcontractors to create, receive, maintain, or transmit Protected Health Information after the Business Associate has received satisfactory assurances in accordance with 45 C.F.R. 164.504(c)(1)(i), that the subcontractor will appropriately safeguard the information. Business Associate will evidence these satisfactory assurances through a written

agreement that complies with all requirements of a Business Associate Agreement under the HIPAA.

(c) <u>Prohibition on Unauthorized Uses and Disclosures</u>. Business Associate agrees to not use or further disclose PHI other than as permitted or required by the Agreement, this BAA or as Required by Law.

(d) <u>PHI of Covered Entity Patients</u>. The parties acknowledge that Business Associate will use and disclose PHI of Individuals who are Covered Entity patients in connection with the treatment (as defined by the Privacy Rule) of such Individuals by Business Associate and its affiliates. The provisions of this BAA shall not apply to any such use or disclosure of PHI; provided that Business Associate shall ensure that all PHI relating to the Covered Entity is only used or disclosed in a manner which is consistent with all applicable state and federal laws, including HIPAA and the Privacy Rule and provided further that Business Associate shall ensure that all PHI relating to the Covered Entity is maintained in a manner consistent with all applicable federal and state laws, including the Security Standards.

(e) <u>Agents</u>. Business Associate will ensure that any agent, including a subcontractor, to whom it provides such information, agrees to implement reasonable and appropriate safeguards to protect it.

(f) <u>Reporting</u>. Business Associate will report to Covered Entity, as soon as reasonably practicable, but not later than within fifteen (15) days following the discovery by Business Associate, of any acquisition, access, Use or Disclosure of Protected Health Information not provided for in this Agreement or not permitted under HIPAA, including, but not limited to, any impermissible access, acquisition, Use or Disclosure that is a Breach of Unsecured Protected Health Information, together with any remedial or mitigating action taken or proposed to be taken with respect thereto. Business Associate shall conduct a risk assessment with respect to any impermissible access, acquisition, Use or Disclosure to determine if there is a significant risk of financial, reputational, or other harm to the individual whose Unsecured Protected Health Information was impermissibly acquired, accessed, used or disclosed. Business Associate shall notify Covered Entity of any such impermissible access, acquisition, Use or Disclosure, including the following information in such notice:

(i) A brief description of how the impermissible access, acquisition, Use or Disclosure occurred and how and when it was discovered;

(ii) A description of whether Unsecured Protected Health Information was involved in the impermissible access, acquisition, Use or Disclosure, and the results of Business Associate's risk assessment; and

(iii) The steps Business Associate is taking to further investigate the impermissible access, acquisition, Use or Disclosure to mitigate losses and to protect against further impermissible access, acquisition, Use or Disclosure.

Business Associate shall cooperate with Covered Entity in mitigating any harmful effects of any such impermissible access, acquisition, Use or Disclosure, and in making any required notification to individuals in the case of a Breach as determined by Covered Entity. Business Associate shall pay for the costs of such mitigation and notification if the Breach was due to a violation of this Agreement by Business Associate, or the negligent or intentional actions of Business Associate.

Business Associate will also report to Covered Entity within fifteen (15) days after discovery by Business Associate any Security Incident. Business Associate shall cooperate with Covered Entity in mitigating any harmful effects of any such Security Incident as determined by Covered Entity. Business Associate shall pay for the costs of such mitigation if the Security Incident was due to a violation of this Agreement by Business Associate, or the negligent or intentional actions of Business Associate.

In connection with any reporting pursuant to this Section 2.2(f), the contact information for the Covered Entity shall be as follows:

2.2.  Maintenance of and Access to PHI.

2.2.1.  Provision of Access to Records and Books Related to PHI. Business Associate agrees to make available to Covered Entity upon its request and in an appropriate manner and time frame (not to exceed ten (10) days from the date of the request) the information necessary for it to comply with its Patients'/Individuals' rights to access, amend and receive an accounting of disclosures of their PHI and to make available to the Secretary of the Department of Health and Human Services its internal practices, books and records relating to the use and disclosure of PHI.

2.2.2.  Obligation to Provide Copies of PHI for Access by Individuals. Within ten (10) days of request by Covered Entity, Business Associate shall provide PHI to Covered Entity so that Covered Entity may permit any Individual whose PHI is maintained by Business Associate in a Designated Record Set created by or maintained on behalf of Covered Entity to have access to and to copy his or her PHI in the format requested unless it is not readily producible in such format, in which case it shall be produced in hard copy format.

2.2.3.  Obligation to Make Necessary Amendments to PHI. Within ten days of receiving a request by Covered Entity, Business Associate agrees to make any amendment(s) to PHI it maintains in a Designated Record Set created by or maintained on behalf of Covered Entity. Business Associate shall refer any requests for amendments made directly by patients or other Individuals to Covered Entity prior to making any such amendments.

2.2.4.  Obligation to Maintain an Audit Trail of PHI Disclosures. Business Associate agrees to maintain sufficient information regarding its disclosures of PHI to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528. Business Associate understands that this requires Business Associate to maintain an audit trail of all such disclosures made within six (6) years of the Individual's request, but does not include disclosures made by Business Associate in connection with the treatment of the patient, the processing of payments for treatment or the operations of Covered Entity or Business Associate. At a minimum, this audit trail shall include the date of any

disclosure, the name of the recipient (and address where possible), a brief description of the PHI disclosed, and the purpose of the disclosure. Accounting of such disclosures shall be available to Covered Entity or the Individual within twenty (20) days of a request. If an Individual requests an accounting directly from Business Associate, Business Associate shall forward a copy of the request to Covered Entity within ten days of its receipt.

2.2.5. <u>Notice of Request for PHI</u>. Business Associate agrees to notify Covered Entity within ten (10) business days of the receipt of any request or subpoena for PHI. Business Associate agrees to provide Covered Entity with the opportunity to challenge the validity of any such request.

3. <u>Obligations of Covered Entity</u>.

3.1. <u>Provision of Privacy Practices</u>. Upon request, Covered Entity shall provide Business Associate with the Notice of Privacy Practices that Covered Entity produces in accordance with 45 CFR 164.520, as well as any changes to such notice.

3.2. <u>Provision of Patient/Individual Restrictions on Use/Disclosure of PHI</u>. To the extent that Covered Entity permits its Patients or other Individuals to limit the use or disclosure of PHI by means other than or in addition to those means set forth in Covered Entity's Notice of Privacy Practices, Covered Entity shall provide Business Associate with any changes in, or revocation of permission by Individual to use or disclose PHI to the extent that such limitations or changes affect Business Associate's permitted or required uses and disclosures.

3.3. <u>Compliance with Privacy Rule and Notice of Privacy Practices</u>. Covered Entity shall not ask Business Associate to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Covered Entity, except to the extent that such use or disclosure is permitted in accordance with Section 0.

4. <u>Term and Termination</u>.

4.1. <u>Term</u>. The term of this BAA shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity is (a) returned to Covered Entity; or (b) destroyed by Business Associate at the written request of Covered Entity. If it is infeasible to return or destroy the PHI, the protections set forth in Section 4.3 shall be extended to such information.

4.2. <u>Termination for Cause</u>. Upon becoming aware of a material breach of or a pattern of noncompliance with the terms of this BAA by Business Associate, Covered Entity shall provide a reasonable opportunity for Business Associate to cure the breach or end the violation. In the event that the breach is not cured or the violation is not otherwise ended within 30 days or if a cure is not possible, Covered Entity may terminate this BAA. The Parties agree that a material breach of this BAA would result in irreparable harm to Covered Entity and that Covered Entity has the right to immediately seek an injunction and any other available equitable rights and remedies.

4.3. <u>Effect of Termination</u>.

4.3.1. <u>Maintenance/Return/Destruction of PHI</u>. Except as provided in this BAA, upon termination of the Agreement or this BAA for any reason, Business Associate shall maintain (if Covered Entity and Business Associate so agree), return (if so requested by Covered Entity in

KCP-4308917-3

writing) or destroy (if requested by Covered Entity in writing) all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. Business Associate shall maintain in accordance with all applicable laws and regulations all PHI until Covered Entity has specifically instructed Business Associate in writing to return or destroy the PHI. If no such instruction is received by Business Associate from Covered Entity within 90 days of termination of the Agreement, Business Associate may provide the PHI on electronic media to Covered Entity and thereafter destroy any PHI remaining in Business Associate's possession. This provision also shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. If the PHI is returned or destroyed hereunder, Business Associate shall retain no copies of the PHI. If the PHI is destroyed by Business Associate, Business Associate shall, upon Covered Entity's request, provide Covered Entity with a written certification indicating the date and means of that destruction.

4.3.2. Survival of Obligations When Return/Destruction of PHI is Infeasible. In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this BAA to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

5. Miscellaneous.

5.1. Regulatory References. A reference in this BAA to a section in the Privacy Rule means the section as in effect or as amended, and for which compliance is required.

5.2. Amendment. The Parties agree to take such action as is necessary to amend this BAA from time to time as is necessary for Covered Entity to comply with the requirements of the Privacy Rule, Security Standards and the Health Insurance Portability and Accountability Act, Public Law 104-191 as it may be amended or interpreted by a court of law or governmental agency charged with the enforcement of the law or regulations. If the Parties cannot agree on the effect of any such amendment or interpretation, this BAA may be terminated upon written notice to the other Party.

5.3. Survival. The respective rights and obligations of Business Associate under Section 4.3 of this BAA shall survive the termination or expiration of this BAA.

5.4. Interpretation. Any ambiguity in this BAA shall be resolved in favor of a meaning that permits Covered Entity to comply with HIPAA, the Privacy Rule, and the Security Standards.

5.5. Severability. If any part of any provision of this BAA or any other agreement, document or writing given pursuant to or in connection with this BAA shall be invalid or unenforceable under applicable law, said part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of said provision or the remaining provisions of said agreement.

5.6. Waiver. Neither the waiver of a breach of any provision of this BAA, nor a failure to enforce, on one or more occasions, a provision of this BAA (or exercise any right or privilege thereunder) shall constitute a waiver of the provision itself, a waiver of any breach thereafter, or a waiver of any other provision herein.

5.7. <u>Assignment</u>. This BAA may not be assigned, in whole or in part, except with the prior written consent of the non-assigning Party.

SCL HEALTH SYSTEM
Providence Health

ATTACHMENT A

TRANSITION SERVICES AGREEMENT
<u>Delineation of Services for Accounts Payable</u>

| SCL Health System | PRIME Healthcare, Inc. |
|---|---|
| * Assist with proper Lawson access and security for Prime associates during transition | * Manage the vendor add and maintenance process for the new Location code and Pay code vendors that are doing business with PMC and SJL beyond April 1st 2013 |
| * Assist with proper WebNow access and support for invoices dated prior to March 31st | |
| | * Set up new Corporate Accounts with vendors for go-forward business transactions post April 1st. |
| * Assist with proper IAPPROVE Hierarchy for invoices dated prior to March 31st | |
| | * Set appropriate Bill To: expectations with Prime vendors doing business with PMC and SJL >= 4/1/13 |
| * Open, separate, scan, QA, route and upload for GL Acct. Coding and Approval on Non-PO and 3-way matching in directly in Lawson for PO invoices dated prior to March 31st | * Maintain W-9's on Prime vendors doing business with PMC and SJL >= 4/1/13 |
| * Continue providing Checks, ACH and HPX payments to vendors for PMC and SJL invoices dated prior to March 31st | * Supply Credit References for Prime vendor adds |
| | * Do their own OIG, SAM and TIN checking starting on April 1, 2013. |
| * Open, separate and FedEx Prime invoices dated >= April 1st (2X) per week | * Acquire Prime Check Stock, Micr Toner, Envelopes, Sealer Machine, and Postage Machine for AP >= 4/1/13 |
| * Process AP150, AP155 and AP170 for all 4 Prime Process Levels 516, 517, 518 & 519 on M/W/F | * Route Non-PO Paper invoices >= 4/1/13 for hand Signatures and GL Acct. Coding |
| * Send Prime SYS Checks to PMC printer via MHC | |
| | * Enter Non-PO Paper invoices dated >= 4/1/13 straight into Lawson and release for payment. |
| * Remove Prime checks from Positive Pay file | |
| * Test MHC check printing capabilities for US Bank accounts with Prime check stock and Prime electronic signatures on a Prime printer | * Complete 3-way match on PO invoices dated >- 4/1/13 in Lawson for payment |
| | * Work PO 135's, MA 54's, MA 60's and MA64's on invoices and PO's dated >= 4/1/13 |
| * Clear all PO 135 open transactions for PO's and invoices dated <= March 31st | |
| | * Establish new Recurring Payment process with Prime vendors based on Prime Contracts |
| * Clear any open Accounts Payable MA 54 and MA 60 messages prior to the 4/1/13 transition. | |
| | * Build PRIME PO's after Supply chain transitional services stop |
| * Support clearing the MA64 messages related to PMC and SJL invoices dated prior to 4/1/13. | |
| | * Establish a Patient Refund Check Payment process -- currently done through Accounts Payable |
| * Provide Month-end support including WebNow Accruals for Non-PO invoices during the transition services period | |
| | * Establish a Garnishments and Risk Management Check Payment process currently done through Accounts Payable |
| * Forward any Customer Service calls or emails to PMC and SJL associates for invoices date >= 4/1/13 and handle any Customer Service for invoices <= 3/31/13. | * Supply own AP Customer Service via Phone / Email etc. for transactions post April 1, 2013. |

SCL HEALTH SYSTEM
Providence Health

ATTACHMENT A

TRANSITION SERVICES AGREEMENT
Delineation of Services for Accounts Payable

| SCL Health System | PRIME Healthcare, Inc. |
|---|---|
| * Print 1099's for payments made on all invoices dated <= 3/31/13 that are SCL Health System invoices for PMC and SJL<br><br>* Provide Re-classes <= 3/31/13<br><br>* Provide JE support <= 3/31/13 | * Provide Re-classes >= 4/1/13<br><br>* Assist with testing Check Printing capabilities PMC printer<br><br>* Provide JE support >=4/1/13<br><br>*  Support Non-PO AP Accruals >=4/1/13<br><br>* Support Month-end<br><br>* Print 1099's for payments made on all invoices dated >= 4/1/13 that are PRIME invoices for PMC and SJL<br><br>* Provide own cash management for PRIME accounts<br><br>* Provide deposits for Utility companies with new Corporate accounts<br><br>* Create a new McKesson payment solution to replace the next day sweep payments we currently have in place<br><br>* Provide Stark Law Review and Compliance<br><br>* Communicate to PRIME EDI vendors how to invoice post 3/31/2013<br><br>* Communicate to ACH and HPX vendors that payments will be made on Paper checks post 3/31/13 from PRIME. |

SCL Health System                                    ATTACHMENT B
Providence Health

### TRANSITION SERVICES AGREEMENT
### Lawson Support Services

**Daily and As needed**

1. Epic File Interface – Resolving Error messages, creating new crosswalk mappings (Cannot be shifted to Prime Health as long as part of SCLHS Lawson GL Company 1864)
2. Activities Module – Build Construction In Process (CIP) Activities  (can be shifted to Prime Health staff with training from SCLHS)
3. Asset Management – Capitalize Assets (Can be shifted to Prime Health Staff with  training from SCLHS)
4. General Ledger Support - Adding and maintaining Accounting Units (department)  (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
5. General Ledger Support - Adding and maintaining Accounts (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
6. Nightly batch jobs to Interface and post other modules (AP, PR, AM, etc) into General Ledger (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
7. Security class build and maintenance (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
8. New user set up (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
9. Questions & Trouble shooting Lawson issues
10. Transition Training\Knowledge Transfer
11. AP Invoice Uploads\Interface
    a. Perfect Output (copy machines) (Will discontinue -Prime Health AP staff will enter manually)
    b. Corporate Records (Boxes) (Will discontinue -Prime Health AP staff will enter manually)
    c. American Express  (Will discontinue, Prime Health will not use SCLHS AMEX cards)
    d. Office Depot – (Will Discontinue – Prime Health Staff AP Staff will enter manually)
    e. FDSI  (Freight) (Will Discontinue – Prime Health will enter manually)
    f. Patient Refunds Interface – (Not sure if can be shifted to Prime Health or not – Subject Matter Expert is on vacation until Monday)
12. Strata Jazz – Capital Approval Process (will discontinue after March 31, 2013)
13. Lawson Business Intelligence (LBI) Departmental operating reports (will discontinue after March 31, 2012 month end close)
    a. New User set up and maintenance
    b. Report maintenance

SCL Health System                              ATTACHMENT B
Providence Health

**TRANSITION SERVICES AGREEMENT**
**Lawson Support Services**

**Monthly**

1. AP136 Reconciliation to XXX11000-20401 (Lawson Accounts Payable) (Can be shifted to Prime Health Staff with Training).
2. PO135 (Received Not Invoiced)Reconciliation and Adjustment to XXX11000-20405 Reconciliation (Can be shifted to Prime Health Staff with Training from SCLHS)
3. Company 1864 - Month end close for Accounts Payable Module (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
4. Company 1864 – Asset Management Depreciation Accrual Module (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
5. Company 1864 – Month End Close for Asset Management Module (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
6. Company 1864 – Month End Close for General Ledger Module (Cannot be shifted to Prime Health Staff as long as part of SCLHS Lawson GL Company 1864)
7. Monthly Report Distribution (Can be shifted to Prime Health Staff with Training).
   a. Contract Labor Report
   b. New Permanent Vendor List
   c. New One Time Vendor List

**Annually**

1. Company 1864 - Year end close for Accounts Payable Module (Cannot be shifted to Prime Health Staff)
2. Company 1864 – Year End Close for Asset Management Module (Cannot be shifted to Prime Health Staff)
3. Company 1864 – Year End Close for General Ledger Module (Cannot be shifted to Prime Health Staff)
4. AP Invoice Archiving (Cannot be shifted to Prime Health Staff)
5. Supplemental AP1099 load (Can be shifted to Prime Health Staff)

SCL Health System
Providence Health

ATTACHMENT C

**TRANSITION SERVICES AGREEMENT**
**Payroll Support Services**

Functional Area:       Finance
Department Name:    Payroll

**Current Services Description:**

- Load one-time deduction, Process PR113 tax deduction update and corrections.
- Perform PR82 payroll adjustments to associate's "buckets" for hours, wages, and deductions.
- Process and post LP140 and LP197 manual PTO/ESL adjustments.
  Create check files for PR160.
- Close payroll PR1978 and balance, post payroll to the GL PR198.
- Create care site reports.
- Transfer PTO/ESL accrual balances from Lawson to Kronos.
- Create month -end PTO accruals LP198.

**Roles and Responsibilities**

| PMC/SJL/Prime<br>• Activities performed and capabilities in place as of 4/1/13 | SCLHS<br>• Activities performed and capabilities in place as of 4/1/13<br>• Will be transitions as Prime implements additional operational capabilities (people, process, technology)<br>• Update to Service Descriptions |
|---|---|
| • Process LP140 to process manual PTO and ESL adjustments<br>• Process LP197 to post manual PTO and ESL adjustments to associate balances<br>• Process all functions regarding associate garnishments<br>• Create life Insurance imputed income time records BN150<br>• Enter and process standard time records in Lawson PR30, PR134<br>• Process all prior pay period adjustments, retro pay, lump sum pays, etc.<br>• Enter PR39 one time deductions<br>• Reconcile Kronos and ensure that all time cards are approved by managers.<br>• Extract hours from Kronos to Lawson to pay.<br>• Reconcile time feed from Kronos to Lawson and send to System Office Payroll<br>• Process KR102 to modify Kronos time load into Lawson<br>• Process PR530 to load Kronos time into a Lawson batch and review and fix errors<br>• Fix time records in Lawson on PR35.2. | • Provide general support/questions for local Payroll resource<br>• Support paycard enrollment/processing/corrections<br>• Load one time deductions<br>• Process PR113 tax deduction update and corrections<br>• Perform PR82 payroll adjustments to associate's "buckets" for hours, wages, and deductions.<br>• Process and post LP140 and LP197 manual PTO/ESL adjustments<br>• Process FLSA overtime calculation PR132<br>• Process PR140 payroll and deduction calculation<br>• Balance PR140 payroll calculation<br>• Process and post LP140 and LP197 PTO/ESL usage and accrual<br>• Process and post LP180 and LP197 plan balance transfers for associates with grandfathered PTO accruals<br>• Create check and ACH files PR160<br>• Import check files into MHC<br>• Create check and ach remittance images<br>• Create payment register PR162<br>• Create payroll register PR141 |

SCL Health System
Providence Health

ATTACHMENT C

**TRANSITION SERVICES AGREEMENT**
**Payroll Support Services**

| PMC/SJL/Prime | SCLHS |
|---|---|
| • *Activities performed and capabilities in place as of 4/1/13* | • *Activities performed and capabilities in place as of 4/1/13*<br>• *Will be transitions as Prime implements additional operational capabilities (people, process, technology)*<br>• *Update to Service Descriptions* |
| • Release all time records from batch status to current status<br>• Process PR135 time record edit<br>• Process PR132 FLSA overtime calculation<br>• Process PR139 arrears<br>• Process PR140 earnings and deductions calculation<br>• Balance PR140 spreadsheet<br>• Print all paper checks after System Office payroll creates them<br>• Prepare payroll audit trail spreadsheet<br>• Enter manual checks as needed PR80<br>• Create Fidelity and Credit Union check requests<br>• Create and send all required reports including but not limited to: gift shop, foundation, A/R for RSC, etc.<br>• Perform all required stop payments, ach reversals and pullbacks, and voids as required at the bank and in Lawson<br><br>*Monthly only:*<br>• Process PR140 for accrual calculation only (month end)<br><br>*Quarterly only:*<br>• Reconcile quarterly wages | • Close payroll PR197 and balance<br>• Post payroll to the GL PR198 and balance<br>• Create and send reports to care sites<br>• Transfer PTO/ESL accrual balances from Lawson to Kronos<br>• Process miscellaneous corrections<br>• Management of Payroll staff<br><br>*Monthly only:*<br>• create end of month PTO accruals LP198<br><br>*Services that may be required in the future, billed on T&M:*<br>• Creative positive pay file in MHC<br>• Transmit positive pay file to bank<br>• Transmit direct deposit file to bank<br>• Call in control totals to bank<br>• Transmit prenote file to the bank<br>• Call in control totals to bank<br>• Create and transmit ADP tax file to ADP<br>• ADP reconciliation<br>• ADP quarterly validation and filings<br>• Payroll Management of above "unknown" tasks |

ATTACHMENT D

**SCL HEALTH SYSTEM**

Providence Health
TRANSITION SERVICES AGREEMENT
Description of Services

▪ *Business Continuation Services* – These are the agreed-upon services that will be provided by the system to Prime during the Transition Period to support its current operations, similar to the level of support provided by SCL Health System, for the selected services, to PH as an affiliate. Given that SCL Health System has not supported the operations of a former affiliate in the past, the system is committed to acting responsibly and in good faith to provide the requested services but cannot be accountable for results, especially in light of unanticipated events

▪ *Transition Support Services* – These are one-time and/or ongoing system services that will be provided to Prime during the Transition Period that are separate and distinct from the Business Continuation Services currently provided by SCL Health System to PH as an affiliate. These services include, but are not limited to, unanticipated efforts by system associates to support Prime operations during the Transition Period and/or work (e.g., conveyance of knowledge) by system staff to support their efforts to become a stand-alone entity

▪ *Short Term "Carry Over" Services* – Throughout our discussions with Prime leadership, there have been a number of services that Prime anticipates taking over themselves immediately following the realignment. Recognizing that there may be some instances whereby Prime does not fully transition these services by closing, these are services that will be provided by the system to Prime for a very limited time (e.g., 30 to 90 days) following the closing that support operations while Prime establishes its own services and/or arrangements with vendors

Kansas.gov | State Phone Directory | Online Services                    Home | Contact | FAQs



Simple Steps for Success

| Thinking | Starting | Maintaining | Closing |

# Business Entity Search

**Date:** 07/19/2013

Be advised the business information on this page is for summary informational purposes only. It is not an official filing with the Secretary of State's office and should not be relied on as such. Please view actual documents filed by customers with the secretary of State's office to ensure accurate information. When filing a Uniform Commercial Code statement on an entity, consult with your attorney to ensure the correct debtor name.

## Business Summary

**Current Entity Name**

PRIME HEALTHCARE SERVICES - SAINT JOHN LEAVENWORTH, LLC

File Name Change Online

**Business Entity ID Number**

4692034

View History and Documents

Current Mailing Address: R. DAVID GRANT - 3300 E. GUASTI ROAD, 3RD FLOOR, ONTARIO, CA 91761

Update

Business Entity Type: FOREIGN LTD LIABILITY COMPANY

Date of Formation in Kansas: 02/14/2013

State of Organization: DE

Current Status: ACTIVE AND IN GOOD STANDING

Certificate of Good Standing

### Resident Agent and Registered Office

**Resident Agent:** NATIONAL CORPORATE RESEARCH, LTD.

**Registered Office:** 2101 S.W. 21ST STREET, TOPEKA, KS 66604

Update Resident Agent/Office

**EXHIBIT 8**

**Annual Reports**

The following annual report information is valid for active and delinquent status entities only.

Tax Closing Month: 12

The Last Annual Report on File: 00/0000

**Next Annual Report Due:** 04/15/2014    [ File Online ]

**Forfeiture Date:** 07/15/2014

[ Close Your Business ]

Be advised the business information on this page is for summary informational purposes only. It is not an official filing with the Secretary of State's office and should not be relied on as such. Please view actual documents filed by customers with the secretary of State's office to ensure accurate information. When filing a Uniform Commercial Code statement on an entity, consult with your attorney to ensure the correct debtor name.

- © 2013 Kansas.gov
- Portal Policies
- Help Center
- Contact Us
- About Us
- Site Map

Kansas Business Entity Search

Page 1 of 2



Kansas

**Business**Center

Simple Steps for Success

| Thinking | Starting | Maintaining | Closing |

# Business Entity Search

**Date:** 07/19/2013

Be advised the business information on this page is for summary informational purposes only. It is not an official filing with the Secretary of State's office and should not be relied on as such. Please view actual documents filed by customers with the secretary of State's office to ensure accurate information. When filing a Uniform Commercial Code statement on an entity, consult with your attorney to ensure the correct debtor name.

## Business Summary

**Current Entity Name**

PRIME HEALTHCARE SERVICES - PROVIDENCE, LLC

[File Name Change Online]

**Business Entity ID Number**

4689188

[View History and Documents]

Current Mailing Address: R. DAVID GRANT - 3300 E. GUASTI ROAD, 3RD FLOOR, ONTARIO, CA 91761

[Update]

Business Entity Type: FOREIGN LTD LIABILITY COMPANY

Date of Formation in Kansas: 02/04/2013

State of Organization: DE

Current Status: ACTIVE AND IN GOOD STANDING

[Certificate of Good Standing]

**Resident Agent and Registered Office**

**Resident Agent:** NATIONAL CORPORATE RESEARCH, LTD.

**Registered Office:** 2101 S.W. 21ST STREET, TOPEKA, KS 66604

[Update Resident Agent/Office]

## Annual Reports

The following annual report information is valid for active and delinquent status entities only.

Tax Closing Month: 12

The Last Annual Report on File: 00/0000

**Next Annual Report Due:** 04/15/2014   [ File Online ]

**Forfeiture Date:** 07/15/2014

[ Close Your Business ]

Be advised the business information on this page is for summary informational purposes only. It is not an official filing with the Secretary of State's office and should not be relied on as such. Please view actual documents filed by customers with the secretary of State's office to ensure accurate information. When filing a Uniform Commercial Code statement on an entity, consult with your attorney to ensure the correct debtor name.

- © 2013 Kansas.gov
- Portal Policies
- Help Center
- Contact Us
- About Us
- Site Map